UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT        <u>3:23-mj-493 RMS</u>

In the Matter of the Search of a
Postal Parcel

## <u>AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT</u>

I, Postal Inspector Team Leader Kimberly E. Dallas, being duly sworn, herby deposes

and states:

### I.        Affiant Training and Background

1. I am a Postal Inspector Team Leader with the United States Postal Inspection Service

(USPIS), and have been so employed since August 2010. I have been assigned to the

USPIS's Boston Division, New Haven domicile since March 2020. Over the course of my

career, I have participated in multiple investigations of criminal activity, including

investigations involving the unlawful mailing, possession, sale, and distribution of

firearms.

2. Based upon this experience, and through the experience of other agents and officers

with numerous years of experience, I have also become well versed in the methods

used in firearms trafficking, the specific type of language used by firearms traffickers,

and the unique patterns employed by these organizations. I have also conducted

physical, electronic, and wire surveillance. Additionally, I have arrested individuals for

various firearms violations and have spoken with a number of law enforcement officers,

and subjects concerning the methods and practices of firearm traffickers. As a result of

my law enforcement experiences and the experience of other agents and detectives, I

have worked with to investigate firearms traffickers. I have also conducted investigations

involving the identification of co-conspirators using telephone records and bills, financial

records, photographs, and other documents. In my experience, firearms traffickers will

often use misleading, false return addresses, and or addresses they are familiar with on parcel that contain firearms to further conceal the shipper of the firearm.

**II.**     Request

3. As part of my duties, I am currently participating in an investigation into firearms trafficking by Brian BAKER, Algelly DIAZ, Ramond PICHARDO, and others. Based on the facts set forth in this affidavit, there is probable cause to believe, and I do believe, that violations of Title 18 U.S.C. § 933 (Trafficking in Firearms); Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations); and Title 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Convicted Felon) (hereafter referred to as the "Target Offenses") have been committed by Brian BAKER, Algelly DIAZ, Ramond PICHARDO, and others.

4. I make this affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search United States Postal Service (USPS) Priority Parcel with tracking number 9505 5119 4426 3135 3902 03 (hereafter the SUBJECT PARCEL), identified in Attachment A, incorporated, and below, for evidence of the Target Offenses, identified in Attachment B, incorporated.

5. The SUBJECT PARCEL is described as USPS priority parcel with tracking number 9505 5119 4426 3135 3902 03 weighing approximately 11 pounds and 8 ounces, with the dimensions of approximately 25.5" x 7" x 7". The addressee is listed as "Angely Diaz, [a particular address on] Whitmore Street in Hartford, CT 06114" and the return address is listed as "R. GRANADOS, [at a particular address on ] EDNA DR., EVERMAN Tx. 76140." The SUBJECT PARCEL was mailed from the Southeast Station located at 500 S Forest Hill Drive, Fort Worth, TX 76140-4830 on May 15, 2023, at approximately 12:06 local time.  *See* photo of the SUBJECT PARCEL below:



6.   As detailed below, there is probable cause to believe that the SUBJECT PARCEL

contains evidence, fruits, and instrumentalities of violations of the Target Offenses.

7. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience, and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information (ESI). Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the SUBJECT PARCEL, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**III.    Probable Cause**

8. The USPIS, the Federal Bureau of Investigations (FBI) and other law enforcement agencies are investigating a gun trafficking organization (hereafter, "GTO") involving BAKER, DIAZ, and co-conspirators in and around Connecticut, Kansas, and California. As set forth above, BAKER and DIAZ are believed to be utilizing the U.S Mail to illegally ship firearms in furtherance of the Target Offenses. *See also* Attachment C, *Affidavit from May 19, 2023*, incorporated.

9. As detailed herein, BAKER, a resident of Scott City, Kansas, is believed to ship the firearms through the USPS on behalf of the GTO. BAKER has the following felony convictions: Burglary in the Second Degree (sentenced in 2007 to sixteen months); Vehicle Theft (sentenced in 2007 to twenty-four months); Assault with a Deadly Weapon (sentenced in 2007 to eight months); and Evading Police (sentenced in 2007 to forty-months).

10. DIAZ, a resident of Hartford, Connecticut, is believed to coordinate the receipt of firearms in Connecticut through the USPS and the storage of such firearms at a stash location in Hartford, Connecticut, on behalf of the GTO. DIAZ has the following felony convictions: Criminal Weapon Possession (sentenced in 2015 to eight years); Robbery in the First Degree (sentenced in 2007 to twenty years, suspended after eight years);

Sale of a Controlled Substance (sentenced in 2004 to two years); and Possession of Narcotics (sentenced in 2002 to two years suspended).

11. In April 2023, FBI agents provided a particular address on Whitmore Street in Hartford, CT 06114, (hereafter the Subject Address), as an address where firearm shipments are being received.

12. While monitoring inbound mail to the Subject Address, I identified that on May 1, 2023, two packages were mailed from Scott City, Kansas to the Subject Address. The two parcels are further described as follows:

   a. USPS parcel with tracking number 9505 5116 2542 3121 2638 52 mailed on May 1, 2023. The parcel was mailed from the Scott City Main Post Office, 211 S Main Street, Scott City, KS 67871-9998 at approximately 10:12 local time and paid for in cash. The parcel weighed approximately 7 lbs. 14 ounces. The parcel was delivered to the Subject Address on May 3, 2023, at approximately 10:05 local time.

   b. USPS parcel with tracking number 9505 5116 2542 3121 2638 76 mailed on May 1, 2023. The parcel was mailed from the Scott City Main Post Office, 211 S Main Street, Scott City, KS 67871-9998 at approximately 10:13 local time and paid for in cash. The parcel weighed approximately 9 lbs. 12 ounces. The parcel was delivered to the Subject Address on May 3, 2023, at approximately 10:05 local time.

13. On May 3, 2023, agents from the FBI and other law enforcement agencies conducted surveillance on the Subject Address and witnessed DIAZ at the Subject Address receive delivery of the two parcels.

14. These parcels were later recovered by agents from the FBI and other law enforcement agencies through a controlled purchase. Inside the USPS parcel with tracking number 9505 5116 2542 3121 2638 76 was three (3) black plastic Glock boxes. Within the Glock

boxes were one polymer 80 style handgun with no serial number, one Glock model 17 with serial number BNRZ988, and one Glock model 22 with serial number DGP572. Within the USPS parcel with tracking number 9505 5116 2542 3121 2638 52 was a CZ model Scorpion with serial number G066709. Investigators observed that several of the mailing labels were ripped off the packages, however, the tracking numbers were still present on the boxes.

15. The Bureau of Alcohol Tobacco and Firearms and Explosives (ATF) preformed an analysis on the two Glock firearms which were recovered and it was discovered that BAKER's spouse originally purchased the Glock model 17 bearing serial number BNRZ988, and the Glock model 22 bearing serial number DGP572, on April 28, 2023, from Postrock Trading Company West located at 1203 North Taylor Avenue, Garden City, Kansas. The CZ model Scorpion with serial number G066709 was purchased on April 26, 2023, by Ramond PICHARDO. The fourth firearm purchased is polymer 80 style handgun with no serial number, commonly referred to as a "Ghost Gun," for which no trace information is identified. I believe based on this information and other information gathered during the investigation that BAKER was the shipper of the two parcels.

16. Upon seizing the firearms and the USPS boxes described above, investigators weighed each box with the firearms included. One of the packages weighed approximately 7 lbs. 14 oz. and the other package weighed approximately 9 lbs. 11 oz. As stated previously, USPS parcel with tracking number 9505 5116 2542 3121 2638 52 weighed approximately 7 lbs. 14 ounces and USPS parcel with tracking number 9505 5116 2542 3121 2638 72 weighed approximately 9 lbs. 12 ounces. Both of these weights are consistent with the weights of the parcels while in transit.

17. On May 9, 2023, while monitoring inbound parcels to Subject Address, I identified the following two parcels destined for the Subject Address:

a. USPS parcel with tracking number 9505 5116 2541 3129 2469 26 was mailed on May 9, 2023, from the Scott City Main Post Office, 211 S Main Street, Scott City, KS 67871-9998 at approximately 8:32 local time. The parcel weighed approximately 13 lbs. 5 ounces. This parcel was delivered to the Subject Address on May 11, 2023, at approximately 10:18 local time.

b. USPS parcel with tracking number 9505 5116 2541 3129 2469 02 was mailed on May 9, 2023, from the Scott City Main Post Office, 211 S Main Street, Scott City, KS 67871-9998 at approximately 8:30 local time. The parcel weighed approximately 7 lbs. 10 ounces. This parcel was delivered to the Subject Address on May 12, 2023, at approximately 09:57 local time.

18. Agents from the FBI informed that on May 8, 2023, another co-conspirator was in contact with BAKER which was a day before the parcels were shipped.

19. On May 11, 2023, agents from the FBI and other law enforcement agencies conducted surveillance on the Subject Address and witnessed DIAZ at the Subject Address receive USPS parcel with tracking number 9505 5116 2541 3129 2469 26. The other parcel had been delayed in transit and would not be delivered until the following day.

20. Via a controlled purchase on May 11, 2023, agents from the FBI and other law enforcement agencies recovered USPS parcel with tracking number 9505 5116 2541 3129 2469 26 which contained one firearm was a CZ model Scorpion 9mm bearing serial number G159954. The other firearm was a Del-Ton model DTI-15 5.56 caliber rifle bearing serial number S259413.

21. FBI agents advised there was a lot of phone communication between DIAZ and other co-conspirators after the second parcel was not delivered on May 11, 2023.

22. On May 12, 2023, agents from the FBI and other law enforcement agencies conducted surveillance on the Subject Address and witnessed DIAZ at the Subject Address receive USPS parcel with tracking number 9505 5116 2541 3129 2469 02.

23. Via a controlled purchase on May 12, 2023, agents from the FBI and other law enforcement agencies recovered USPS parcel with tracking number 9505 5116 2541 3129 2469 26 which contained three (3) firearms wrapped in bubble wrap and aluminum foil. One firearm was a Springfield Armory model Hellcat 9mm bearing serial number BB280162. One firearm was a Glock model 27 .40 caliber bearing serial number BCTE168. One firearm was a Ruger model SR1911 .45 caliber, bearing serial number 673-70700. Investigators weighted the package with the firearms inside, and determined that the package received weighted approximately 7 lbs. 9.5 oz. This weight is consistent with the weight of the parcel during transit. Given the contents of this parcel, I believe the phone communications between DIAZ and other co-conspirators are consistent with being concerned with the location of the parcel and its contents.

24. On May 17, 2023, while monitoring inbound parcels to Subject Address, I identified the SUBJECT PARCEL had been mailed from Fort Worth, Texas, destined to the Subject Address. I was informed by agents from the FBI that BAKER was in Texas at the time of the mailing of the SUBJECT PARCEL based on the location information for his cellular telephone.

25. On May 18, 2023, I recovered the SUBJECT PARCEL from the Murphy Road Carrier Annex located at 70 Murphy Road Ste 1, Hartford, CT 06114. The SUBJECT PARCEL has been secured in my office, in its original condition since it has been in my custody.

26. On May 18, 2023, an individual who identified themselves as "Angelly Diaz" using phone number 860-996-4514 called the USPS customer service line to inquire about the location of the SUBJECT PARCEL. Given the information outlined above, I believe DIAZ was concerned about the parcel's location, which evidences that the SUBJECT PARCEL, like prior parcels described above, contains evidence of the Target Offenses. Phone number 860-996-4514 has been identified as a phone number used by DIAZ in connection to the Target Offenses.

27. Per USPS records, I have identified approximately twenty-three other parcels that were destined and delivered to the Subject Address since October 2022. Thirteen of these parcels were mailed from Scott City, KS. The earliest parcel I identified from Scott City, KS, was mailed on October 1, 2022.  The other ten parcels were mailed from Diamond Bar, CA, which is the city Fernando Soto, Jr., another co-conspirator resides.  The earliest parcel from Diamond Bar, CA, identified to date was mailed on October 3, 2022. I know based on my training and other investigations that the traffickers of firearms and other illegal good will ship multiple parcels in a relatively short period of time.

28. CLEAR, a law enforcement database, revealed that a "Ramil Granados" and a "Ramiro Granados" are associated with the particular address on Edna Drive, Everman, Texas, that is listed as the return address for the SUBJECT PARCEL.

**IV.    Conclusion**

29. In light of the foregoing information, and based on my training and experience in other firearms investigations, I submit that there is probable cause to believe the SUBJECT PARCEL may contain evidence of the Target Offenses, and that evidence, fruits, and instrumentalities of the violation can be found in the SUBJECT PARCEL.

Kimberly E. Dallas

Digitally signed by
Kimberly E. Dallas
Date: 2023.05.24
12:19:28 -04'00'

KIMBERLY E. DALLAS
Postal Inspector Team Leader
United States Postal Inspection Service

Sworn to before me by phone or other reliable means this _____ 24th day of May 2023

Robert M. Spector

Digitally signed by Robert
M. Spector
Date: 2023.05.24
12:53:07 -04'00'

HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF CONNECTICUT

## ATTACHMENT A

### Property to be Searched – the SUBJECT PARCEL

The SUBJECT PARCEL is described as USPS priority parcel with tracking number 9505 5119 4426 3135 3902 03 weighing approximately 11 pounds and 8 ounces, with the dimensions of approximately 25.5" x 7" x 7".  The addressee is listed as "Angely Diaz, [at a particular location on] Whitmore St, 2nd Floor, Hartford, CT 06114" and the return address is listed as "R. GRANADOS, [at a particular location on] EDNA DR., EVERMAN Tx. 76140."



## <u>ATTACHMENT B</u>

**Particular Things to be Seized**

Evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §§ 1715, 933(a), 922(g)(1) including United States currency, firearms, ammunition, firearm accessories, and records.

Attachment C
May 19, 2023 Affidavit

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR ARREST WARRANTS, CRIMINAL COMPLAINTS, AND SEARCH WARRANTS | Case No. **Filed Under Seal** |

## **AFFIDAVIT**

I, Corbett Tomsovic, being first duly sworn, hereby depose and state as follows:

## **INTRODUCTION AND AGENT BACKGROUND**

1.      I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the Unites States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed by the FBI since June 2021. I have been assigned to the FBI's New Haven, Connecticut Field Office, and, more specifically, to the Waterbury Safe Streets Gang Task Force (Task Force). While working on the Task Force, I have conducted investigations of, and have been instructed in, investigative techniques concerning the unlawful possession, sale and distribution of firearms, distribution of illegal narcotics, possession with intent to distribute controlled substances, importation of illegal narcotics, use of communication facilities to conduct illegal narcotics transactions, maintaining places for purposes of manufacturing, distributing or using controlled substances and conspiracies to commit these offenses.

2.      Based upon this experience, and through the experience of other agents and Task Force Officers with numerous years of experience, I have also become well versed in the methods used in illegal narcotics and firearms trafficking, the specific type of language used by illegal narcotics and firearms traffickers, and the unique patterns employed by these

organizations.  I have also conducted physical, electronic, and wire surveillance. Additionally, I have arrested individuals for various drug and firearms violations and have spoken with a number of law enforcement officers, subjects, and confidential sources concerning the methods and practices of drug and firearm traffickers. As a result of my law enforcement experiences and the experience of other agents and detectives, I have worked with to investigate drug and firearms traffickers, I have found that they rarely speak openly about their illegal narcotics or firearm transactions. Instead, they use coded language to disguise their conversations about their activities and communicate via text messages. I am also aware that cellular telephones provide illegal narcotics and firearms traffickers with mobile access and control over their illegal trade. They often use cellular telephones to communicate with one another in furtherance of their illegal activities via both voice and text message communications. I also know that illegal narcotics and firearms traffickers routinely use false information when registering their cellular telephones and use cellular telephone numbers and cellular telephones for short periods of time. I have also conducted investigations involving the identification of co-conspirators using telephone records and bills, financial records, drug ledgers, photographs, and other documents.

3.     Based upon the totality of the facts and circumstances set forth herein, and based on my training and experience and consultation with fellow law enforcement officers, I know

a. That narcotics traffickers must maintain on hand U.S. currency in order to maintain and finance their ongoing narcotics business;

b. That narcotics traffickers maintain books, records, receipts, notes, ledgers, money orders and other papers relating to the transportation, receipts, sales, and distribution of controlled substances.

c.  That the aforementioned books, records, receipts, notes, ledgers, and etcetera, are maintained where traffickers have ready access to them – frequently at their residences, stash houses, and vehicles;

d.  That persons involved in narcotics trafficking conceal in their residences, stash houses, and vehicles, caches of drugs, scales, drug packing materials, cutting agents, diluents, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; and the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from narcotics trafficking activities;

e.  That narcotics traffickers commonly maintain addresses or telephone numbers in books, papers, cellular telephones, or electronic organizers, which reflect the names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization.  Traffickers also maintain photographs and videos of participants and associates in narcotics trafficking activity, as well as property acquired as a result of narcotics trafficking activities;

f.  That narcotics traffickers commonly have in their possession, at their residences, or in their vehicles, firearms or other weapons that are used to protect and secure a drug trafficker's property;

g.  That it is common for narcotics traffickers to hide contraband, proceeds of drug sales and records of drug transaction as well as documents relating to the acquisition and disposition of assets, and firearms in secure locations

within their residences and stash houses, including in safes and secure

containers for ready access and for concealment of those items from law

enforcement;

h.   That individuals commonly keep their cellular telephones on their person

or in a nearby location, including in their vehicles or residences, so that

they can use their cellular telephone to communicate with other

individuals.

4.      From my experience and training, I know that narcotics traffickers often use

cellular telephones, and often speak to one another using coded, cryptic or slang words and

phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify

them and their activities and to seize their drugs and/or assets. As a result of my training and

experience, I have become familiar with various coded terminology that is common to the

distribution of controlled substances. Further, based upon my training and experience, I know

that drug traffickers frequently have access to several cellular telephones, and that they

periodically use newly acquired cellular telephones. I also know that narcotics traffickers

frequently use cellular telephones subscribed to by other persons and pre-paid cellular telephones

that require the purchaser to provide little or no identifying information to purchase, activate and

utilize, all of which is done in an effort to avoid detection and thwart the efforts of law

enforcement. Based on the above-described training and experience gained in the course of my

career, I am well versed regarding the means and methods used by persons involved in the use,

possession, transportation, distribution and sale of controlled substances, the motivation of such

persons involved in these crimes, and the methods utilized to facilitate narcotics distribution. I

also know that individuals engaged in distributing narcotics will often utilize firearms to protect themselves, their narcotics, and their narcotics proceeds, from robbery.

5.      Based on my training, experience, I know that those engaged in criminal conduct such as narcotics trafficking, will often have photographs, slides, or video movies of themselves, their co-conspirators, contraband, and assets purchased with illegal proceeds. These photographs and video movies are normally in the trafficker's possession or residence or are frequently stored electronically on wireless telephones, i-Pads, computers, and other electronic devices. I also know that individuals engaged in criminal conduct will utilize their phones and various phone related features and applications, such as messenger and text messaging, to contact each other and arrange criminal conduct. Such individuals frequently store the contact information for criminal associates in their phones, often under an alias. Individuals engaging in criminal conduct will also access internet-based applications such as Facebook, in furtherance of their illegal activities. Such individuals will also utilize their phones' GPS or location services to arrange meetings and to find meet locations for the purpose of conduct illegal activities and transactions.

6.      I am familiar with the facts and circumstances of the investigation as a result of my personal participation in the investigation; from discussions with agents of the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), Homeland Security Investigations (HSI), and other law enforcement personnel; from information provided by witnesses involved in the investigation; and from my review of records, reports and affidavits relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have

spoken or whose reports I have read and reviewed. Such statements are among many statements

made by others and are stated in substance and in part unless otherwise indicated. The

information contained in this affidavit is based on this familiarity, and upon information which I

have reviewed and determined to be accurate and reliable. Since this affidavit is being submitted

for the limited purpose of the aforementioned authorizations, I have not included each and every

act known to me concerning this investigation. I have set forth only the facts that I believe are

essential to establish the foundation necessary to support the issuance of the requested court

orders.

7.     As part of my duties, I am currently participating in an investigation into firearms

trafficking by Ramon PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, Luis

PEREZ, and others. Based on the facts set forth in this affidavit, there is probable cause to

believe, and I do believe, that violations of  federal law, including violations of Title 18 U.S.C.

§ 922(a)(6) (False Statement in Purchase of a Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in

Possession of a Firearm); Title 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon);

Title 18 U.S.C. § 932 (Straw Purchasing of Firearms); Title 18 U.S.C. §§ 933(a)(1), (a)(2)

(Trafficking in Firearms); Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title

18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations) (hereafter referred to as the "Subject

Offenses") have been committed, are being committed, and will be committed by Ramon

PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, and Luis PEREZ and others.

This is also probable cause to believe, and I do believe, that PEREZ is also violating Title 18

U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense); and 21

U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Possession with the Intent to Distribute and Distribution of a

Controlled Substance).

8.       As described below, law enforcement believes DIAZ, who resides in Hartford, Connecticut, is receiving firearms shipped in the mail from California and Kansas at a stash location (**Target Location-3**) and that he is storing proceeds from the subsequent sales of the firearms at **Target Location-3** and his residence (**Target Location-2**). Law enforcement also believes that PEREZ, who resides in Waterbury, Connecticut, is selling the illegally obtained firearms to individuals in Connecticut, that he is armed with firearms, that he is distributing narcotics, and that he is using his vehicle (Target Vehicle), his residence (**Target Location-1**), and a laundry mat operated by his wife (**Target Location-7**) in connection to these illegal activities.

9.       DIAZ and PEREZ were both involved in an illegal firearm transaction involving four firearms that occurred in Connecticut on May 3, 2023, which was in fact a controlled purchase led by FBI. The four firearms were shipped to Connecticut from Kansas via the United States Postal Service shortly before the May 3, 2023-transaction. Two subsequent controlled purchases of firearms (on May 11, 2023, and May 12, 2023) that occurred in Connecticut involving firearms shipped from Kansas to Connecticut via the United States Postal Service shortly before the transactions resulted in the purchase of five additional firearms.

10.      At least two of the firearms purchased in Connecticut were purchased by PICHARDO in the days leading up to the controlled purchase in Connecticut. On May 3, 2023, the CHS-1 purchased a CZ Scorpion bearing serial number G066709 that was purchased by PICHARDO in Kansas on April 26, 2023. On May 11, 2023, the CHS-1 purchased a CZ Scorpion bearing serial number G159954 that was purchased by PICHARDO in Kansas on May 8, 2023.

11.     In connection to the three transactions, PEREZ (**Target Telephone-5**) and DIAZ (**Target Telephone-4**) used their respective cellular telephones to communicate with his coconspirators based in Kansas and California in the days leading up to the controlled purchase, the day the firearms were delivered to Connecticut, and following the controlled purchase. Tolls records for the coconspirators' phones, including **Target Telephone-4** and **Target Telephone-5**, reflect collaboration concerning the offer of additional firearms available to purchase by the group. Tolls records for the coconspirators' phones also reflect similar collaboration between the group in connection to other similarly sized packages believed to contain firearms. Law enforcement has also identified smaller parcels, believed to contain proceeds from the illegal sale of firearms, shipped to Kansas from California and Connecticut. At least one parcel believed to contain firearm proceeds was shipped from Connecticut to Kansas from Hartford.

## <u>REQUESTS</u>

12.     I make this affidavit in support of an application for a warrant and criminal complaint authorizing the arrest of Ramon PICHARDO (DOB XX/XX/1990) and respectfully submit that there is probable cause to believe that PICHARDO has committed violations of federal law, specifically Title 18 U.S.C. § 933(a)(1) (Trafficking in Firearms); and Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy).

13.     I make this affidavit in support of an application for a warrant and criminal complaint authorizing the arrest of Algelly DIAZ (DOB XX/XX1983) and respectfully submit that there is probable cause to believe that DIAZ has committed violations of federal law, specifically Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. §§ 933(a)(1), (a)(2) (Trafficking in Firearms); Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); and Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations).

14.     I make this affidavit in support of an application for a warrant and criminal complaint authorizing the arrest of Luis PEREZ (DOB XX/XX/1979) and respectfully submit that there is probable cause to believe that PEREZ has committed violations of federal law, specifically Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. §§ 933(a)(1), (a)(2) (Trafficking in Firearms); Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations); and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Possession with the Intent to Distribute and Distribution of a Controlled Substance).

15.     I submit this affidavit in support of applications for search warrants for the following physical locations (collectively referred to as the "**Target Locations**"), described below and in the respective Attachment A, for evidence as described in the respective Attachment B, incorporated::

> a.  ▮ Winchester Street, Waterbury, Connecticut (**Target Location-1**), as described in Attachment A-1, incorporated, believed to be PEREZ's residence, for evidence of the Subject Offenses as well as 18 U.S.C. § 924(c) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), as described in Attachment B-1, incorporated.
>
> b.  ▮ Franklin Avenue, Apartment 1N, Hartford, Connecticut (**Target Location-2**), as described in Attachment A-2, incorporated, believed to be DIAZ's residence, for evidence of the Subject Offenses, as described in Attachment B-2, incorporated.
>
> c.  ▮ Whitmore Street, Hartford, Connecticut (**Target Location-3**), as described in Attachment A-3, incorporated, believed to be **Target**

**Location-3**, used for receiving and storing firearms, for evidence of the Subject Offenses, as described in Attachment B-3, incorporated.

    d.   159 Manor Avenue, Waterbury, Connecticut (**Target Location-7**), as described in Attachment A-7, incorporated, believed to be a laundromat operated by PEREZ's wife and utilized by PEREZ in connection to trafficking narcotics and firearms, for evidence of the Subject Offenses as well as 18 U.S.C. § 924(c) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), as described in Attachment B-7, incorporated.

16.    I submit this affidavit in support of applications for a search warrant for the following vehicle, described below and in Attachment A-8, for evidence as described in Attachment B-8, incorporated:

    a.   A 2013 gray Infiniti Coupe bearing Connecticut registration BH38075 (Target Vehicle) registered to Luis PEREZ at the address for **Target Location-1**, believed to be used by PEREZ and located in the District of Connecticut.

17.    I submit this a support of applications for search warrants to seize and search the following cellular devices (collectively referred to as the "**Target Telephones**"), described below and in Attachment A-11, for evidence as described in Attachment B-11, incorporated:

    a.   Cellular device assigned 860-996-4514 (hereafter referred to as "**Target Telephone-4**"), believed to be used by DIAZ and believed to be located in the District of Connecticut.

b.   Cellular device assigned 860-672-8243 (hereafter referred to as "**Target Telephone-5**"), believed to be used by PEREZ and believed to be located in the District of Connecticut.

18.   I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B-12, to determine the location of the cellular device assigned call number 860-996-4514 (**Target Telephone-4**) and to determine the location of the cellular device assigned call number 860-672-8243 (**Target Telephone-5**) (collectively referred to as the "Target Telephones"), which are described in Attachment A-12. With respect to **Target Telephone-4** and **Target Telephone-5**, there is probable cause to believe that these two cellular devices are located within the District of Connecticut. There is also probable cause to believe that the locations of the Target Telephones will constitute evidence of those criminal violations. Because collecting the information authorized by such location information may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the warrants for such information are designed to comply with the Pen Register Statute as well as Rule 41. *See* 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

19.   Additionally, the search warrants that I seek for the **Target Telephones** (content and seizure) would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock devices subject to search and/or seizure pursuant to these warrants. I seek the same authorization regarding any phones seized (but not searched) in connection to the search of the

**Target Locations**, the arrest of DIAZ and PEREZ, and the search of the persons' of

PICHARDO, BAKER, SOTO, DIAZ, and PEREZ. I seek this authority based on the following:

a.  I know from my training and experience, as well as from information
found in publicly available materials published by device manufacturers,
that many electronic devices, particularly newer mobile devices and
laptops, offer their users the ability to unlock the device through biometric
features in lieu of a numeric or alphanumeric passcode or password. These
biometric features include fingerprint scanners and facial recognition
features. Some devices offer a combination of these biometric features,
and the user of such devices can select which features they would like to
utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the
ability to unlock the device through his or her fingerprints. For example,
Apple offers a feature called "Touch ID," which allows a user to register
up to five fingerprints that can unlock a device. Once a fingerprint is
registered, a user can unlock the device by pressing the relevant finger to
the device's Touch ID sensor, which is found in the round button (often
referred to as the "home" button) located at the bottom center of the front
of the device. The fingerprint sensors found on devices produced by other
manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable
the ability to unlock the device through his or her face. For example,
Apple offers a facial recognition feature called "Face ID." During the Face

ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

20.     In my training and experience, users of electronic devices often enable the biometric features because they are a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

21.     As discussed in this affidavit, based on my training and experience, I believe that the **Target Telephones** will be found during the execution of the requested search warrants for physical locations or on the person of the respective user at the time of his arrest. I also believe other devices may be found during the search of the **Target Locations**. The passcode or password that would unlock the device subject to search and/or seizure under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search and/or seizure authorized by this warrant.

22.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This

can occur when a device has been restarted, inactive, or has not been unlocked for a certain

period. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48

hours has elapsed since the device was last unlocked or (2) when the device has not been

unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in

the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the

event law enforcement personnel encounter a locked device equipped with biometric features,

the opportunity to unlock the device through a biometric feature may exist for only a short time.

23.     In my training and experience, the person who is in possession of a device or has

the device among his or her belongings at the time the device is found is likely a user of the

device. However, in my training and experience, that person may not be the only user of the

device whose physical characteristics are among those that will unlock the device via biometric

features, and it is also possible that the person in whose possession the device is found is not

actually a user of that device at all. Furthermore, in my training and experience, I know that in

some cases it may not be possible to know with certainty who is the user of a given device, such

as if the device is found in a common area of a premises without any identifying information on

the exterior of the device. Thus, it will likely be necessary for law enforcement to have the

ability to require any individual, who is found at the **Target Locations** and reasonably believed

by law enforcement to be a user of the device, to unlock the device using biometric features in

the same manner as discussed above.

24.     Due to the foregoing, if law enforcement personnel encounter the **Target

Telephones** that are subject to search and seizure pursuant to this warrant or other devices that

are subject to seizure pursuant to the warrant for the **Target Locations** and may be unlocked

using one of the aforementioned biometric features, the warrants I am applying for would permit

law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to either search its contents as authorized by this warrant with respect to the **Target Telephones**, or, with respect to any other devices discovered and seized (but not searched) pursuant to the warrant for the **Target Locations**, enter the device solely to a) change the passcode to allow reentry and b) place the device into airplane mode to facilitate subsequent search by a separate warrant if sought and obtained.

25.     I am not requesting that any force be authorized to effectuate a press or swipe of fingers or to activate facial recognition features. Should any individual refuse to unlock devices using biometric features, I will promptly notify the Court to request an order to show cause for refusal to unlock devices using biometric features, and/or a further order to compel, and/or a request that the refusing individual be held in contempt of this Court.

**PROBABLE CAUSE**

A. **Overview**

26.     The FBI and other law enforcement agencies are investigating a gun trafficking organization (hereafter, "GTO") involving PICHARDO, BAKER, SOTO, DIAZ, and PEREZ, and co-conspirators in and around Connecticut, Kansas, and California. As set forth above, PICHARDO, BAKER, SOTO, DIAZ, and PEREZ are each believed to be utilizing a cellular telephone in furtherance of the Subject Offenses.[1]

27.     As described below, members of the FBI Waterbury Task Force conducted a controlled purchase of firearms from PEREZ in Connecticut utilizing an FBI Confidential Human Source (CHS-1) on May 3, 2023, wherein four firearms were shipped to Connecticut from Kansas to Connecticut via the United States Postal Service (USPS). One of the firearms was purchased by PICHARDO and two of the firearms were purchased by BAKER's wife. The fourth firearm is a firearm without a serial number or identified marking, commonly referred to as a "Ghost Gun," which is illegal to possess in Connecticut under Connecticut General Statutes § 53-206i (manufacture of firearm from polymer plastic without detectible security exemplar) and such possession is a Class C felony under state law. Conn. Gen. Stat. § 53-206i(a), (c).

28.     On May 11, 2023, the CHS-1 conducted a second controlled purchase of two firearms from PEREZ in Connecticut. The two firearms were shipped from Kansas to Connecticut via the USPS. One firearm, a CZ Scorpion bearing serial number G159954, was purchased by PICHARDO in Kansas on May 8, 2023, according to ATF records. The second firearm, a Del-Ton DTI-15 bearing serial number S259413, is illegal to purchase or possess in

---

[1] Unless otherwise noted, all of the times referred to herein are Eastern Standard Time.

Connecticut under Connecticut General Statutes § 53-202b(a)(1) (sale or transfer of an assault weapon) and such possession is a Class C felony under state law.[2]

29.     On May 12, 2023, CHS-1 conducted a third controlled purchase of three firearms from PEREZ in Connecticut. The three firearms were shipped from Kansas to Connecticut via the USPS. One firearm is a Springfield Armory model Hellcat, 9mm, bearing serial number BB280162. One firearm is a Glock model 27, .40 caliber, bearing serial number BCTE168. One firearm is a Ruger model SR1911, .45 caliber, bearing serial number 673-70700.[3]

30.     Historic postal records and toll records for five phones used by the GTO members evidence that the GTO are obtaining firearms in Kansas and sending the firearms to Connecticut for resale either directly from Kansas or to Connecticut via California. Toll records for the GTO members evidence collaboration between the GTO members regarding the firearm purchases, firearm shipments, and firearm delivery.

31.     Based on the investigation to date, law enforcement believes that PICHARDO, a resident of Elkhart, Kansas, is a "straw purchaser" of firearms. A straw purchaser is a person with a clean background who purchases firearms specifically on behalf of another person to conceal the true ownership of the firearm. The true owner of the firearm is often prohibited from legally purchasing a firearm including convicted felons, domestic violence offenders, juveniles, and individuals with mental illness. Other GTO members, BAKER, SOTO, DIAZ, and PEREZ are convicted felons, and thus, cannot lawfully purchase or possess firearms. PICHARDO is the holder and user of a cellular telephone assigned 620-556-8477 (Target Telephone-1), which is

---

[2] Law enforcement is waiting for the trace information pertaining to this firearm.

[3] Law enforcement is waiting for the trace information pertaining to these three firearms.

subscribed to "Ramon Pichardo," and located in the District of Kansas. It is believed

PICHARDO may be storing the firearms, firearm proceeds, or evidence of the Subject Offenses

at his residence located at a particular location on Sunset Drive in Elkhart, Kansas (Target

Location-5).

32.     BAKER, a resident of Scott City, Kansas, is believed to order firearms from

individuals, including PICHARDO, for resell outside Kansas, including to Connecticut. Based

on information gathered thus far, it is believed that PICHARDO purchases the majority of the

firearms from Top Guns, ███████████ Deerfield, Kansas, 67838. It is believed BAKER may

be storing the firearms, firearm proceeds, or evidence of the Subject Offenses at his residence

located at a particular location on Church Street in Scott City, Kansas (Target Location-4).

BAKER then ships the firearms through the USPS on behalf of the GTO. BAKER is the holder

and user of a cellular telephone assigned 760-887-0927 (Target Telephone-2), which is

subscribed to "Brian Baker" and located in the District of Kansas.[4] BAKER has the following

felony convictions: Burglary in the Second Degree (sentenced in 2007 to sixteen months);

Vehicle Theft (sentenced in 2007 to twenty-four months); Assault with a Deadly Weapon

(sentenced in 2007 to eight months); and Evading Police (sentenced in 2007 to forty-months).

33.     SOTO, a resident of Diamond Bar, California, is believed to also broker the

firearm transactions, including coordinating the shipment of some of the firearm orders as well

as mailing some of the firearms through the USPS on behalf of the GTO via his business MF

Express, also based in Diamond Bar, California. SOTO is the holder and user of a cellular

---

[4] On May 10, 2023, the Honorable U.S. Magistrate Judge Kenneth G. Gale of the District of Kansas authorized pen register information and location information for TARGET TELEPHONE-1 and TARGET TELEPHONE-2. Docket Nos. 6:23mj6107(KGG); 6:23mj6108(KGG); 6:23cm60027(JWB); 6:23cm60028(EFM).

telephone assigned 860-680-9565 subscribed to "Fernando SOTO" and located in the Central District of California (Target Telephone-3).[5] It is believed SOTO may be storing the firearms, firearm proceeds, or evidence of the Subject Offenses at his residence/business located at a particular location on Lakeway Drive in Diamond Bar, California (**Target Location-3**). SOTO has the following felony convictions: Burglary in the Third Degree (sentenced in 2012 to eighteen months); Possession of Weapon or Dangerous Instrument in Correctional Institution (sentenced to one year in 1995); Possession of a Pistol Without a Permit (sentenced in 1994 to one year); Failure to Appear in the First Degree (sentenced in 1994 to one year); Attempted Larceny in the Second Degree (sentenced in 1994 to five years); Robbery in the First Degree (sentenced in 1994 to twelve years); Sale Hallucinogen /Narcotics (sentenced in 1992 to five years); and Failure to Appear in the First Degree (sentenced in 1991 to one year).

34.     DIAZ, a resident of Hartford, Connecticut, is believed to coordinate the receipt of firearms in Connecticut through the USPS and the storage of such firearms at a stash location in Hartford, Connecticut, on behalf of the GTO. DIAZ is the holder and user of a cellular telephone assigned 860-996-4514 (**Target Telephone-4**) located in the District of Connecticut. It is believed DIAZ may be storing the firearms, firearm proceeds, or evidence of the Subject Offenses at his residence located at a particular location on Franklin Avenue in Hartford, Connecticut (**Target Location-2**) and a stash location at a particular location on Whitmore Street in Hartford, Connecticut (**Target Location-3**). DIAZ has the following felony convictions: Criminal Weapon Possession (sentenced in 2015 to eight years); Robbery in the First Degree (sentenced in 2007 to twenty years, suspended after eight years); Sale of a Controlled Substance

---

[5] On May 11, 2023, the Honorable U.S. Magistrate Judge Jacqueline Chooljian of the Central District of California authorized location information for TARGET TELEPHONE-3. Docket No. 2:23mj2404.

(sentenced in 2004 to two years); and Possession of Narcotics (sentenced in 2002 to two years suspended).

35.     PEREZ, a resident of Waterbury, Connecticut, is believed to obtain the firearms from DIAZ at the Hartford-based stash location before selling the firearms to individuals throughout Connecticut on behalf of the GTO. PEREZ is the holder and user of a cellular telephone assigned 860-672-8243 (**Target Telephone-5**) located in the District of Connecticut. It is believed PEREZ may be storing the firearms, firearm proceeds, or evidence of the Subject Offenses as well as narcotics trafficking at his residence located at a particular location on Winchester Street in Waterbury, Connecticut (**Target Location-1**) and a business at a particular location on Manor Avenue in Waterbury, Connecticut (**Target Location-7**).[6] PEREZ has the following felony convictions: Unlawful Possession of a Firearm by a Convicted Felon (sentenced forty-two months in 2022);[7] Possession with Intent to Distribute (sentenced five years, suspended, in 2018); Burglary in the First Degree (sentenced to ten years in 2009); Attempted Assault in the First Degree (sentenced to ten years, suspended after forty-two months, in 2006); and Criminal Mischief in the First Degree (sentenced to twenty-five months in 2000). PEREZ is currently on federal supervised release.

**B.  Pre-Purchase Meeting: April 26, 2023**

36.     On April 26, 2023, CHS-1 met with PEREZ for the purpose of ordering firearms at the direction of investigators. CHS-1 met with PEREZ at an agreed upon location in

---

[6] On or about May 11, 2023, the Honorable U.S. Magistrate Judge Robert M. Spector authorized pen register information and location information for **Target Telephone-4** and **Target Telephone-5**. Docket No. 3:23mj456(RMS).

[7] Docket No. 3:19cr304(JAM).

Waterbury, Connecticut. Investigators conducted physical and pole camera surveillance of the meet location. Investigators observed PEREZ's vehicle[8], a 2013 gray Infiniti Coupe bearing Connecticut registration BH38075, (Target Vehicle) parked at the meet location during the meeting between CHS-1 and PEREZ.

37.     During the meeting, PEREZ made representations to CHS-1 about particular types of firearms available to purchase as well as his own firearm usage. PEREZ stated, "I've been a Latin King 31 years Papi" and "I was out there when Patterson and Passaic was beefing with each other. I'm the one that went out there to stop the beef." PEREZ stated, "If you want Glocks, Glocks went up." CHS-1 stated, "See I got three people lined up right now but they don't want no, no, no, they like that clean shit cause it don't have history to it." PEREZ responded, "No, everything I get, alright check this out my plug is a contractor for Winchester, Colt, and Remington so they give it to him to test fire the guns, try them out whatever, whatever and he basically writes what he feels about it. You know what I'm saying? He tests them. I get them with the serial numbers still on them before they registered in the system." CHS-1 responded, "Official, official so that's what they like." PEREZ responded, "But they not a ghost gun so you're not looking at, you're not looking at fed time and shit but if you get caught it's still state time but it's just (unintelligible)." Later, PEREZ stated, "That right there, Scorpion, I got the desert storm brown one. I paid three bands for that but the drums for it are on back order, alright. I paid an extra 200 for two drums." CHS-1 responded, "See, I got a order for three people right now. How much, would you do a bundle packages if I do more than one, more than one?"

---

[8] On April 20, 2023, the Honorable U.S. Magistrate Judge Maria E. Garcia of the District of Connecticut authorized a tracking warrant for **Target Vehicle**, a 2013 gray Infiniti Coupe bearing Connecticut registration BH38075, known to be operated by PEREZ. Docket No. Docket No. 3:23mj368(MEG). The tracking device was installed on **Target Vehicle** by investigators on April 21, 2023.

PEREZ responded, "Now the thing is, remember I'm only charging a hundred dollars what I'm paying or a hundred dollars more than what I'm paying for the gun so if I'm giving you a Glock for thirteen, I paid twelve for it."

38.     Later in the conversation PEREZ stated, "Now you said you already have one Scorpion on deck, right?" PEREZ responded, "No, that's my personal, yeah, like my two 1911's that I got in the glove, those are my personals." CHS-1 later advised investigators that at this point during the meeting, PEREZ showed him/her two firearms that were in the glovebox of Target Vehicle.

39.     Later in the conversation CHS-1 asked, "But um so what's on deck right now so I can offer it to them yo cause I got three people lined up. He wanted a revolver but I'm gonna go tell him listen you gotta take what you gotta take." PEREZ responded, "We got um mini forty and we got a P80 Glock 17. I got, I got that same Glock 17 but I bought a 50 round drum and a 32 round clip for it and I got the switch for mine." I believe, based on my training and experience, that when PEREZ stated, "I got the switch for mine" it was a reference to a handgun conversion piece used to transition a firearm from semi-automatic to fully automatic.

40.     Later in the conversation CHS-1 stated, "One of them wanted a revolver cause he don't want no shells spitting out, I respect that you feel me?" PEREZ responded, "So, so do what I do, when you load your shells put a, put a sock on each hand." CHS-1 responded, "That shit work?" PEREZ responded, "Hell yeah, you can't leave prints you aint, if your finger not touching it." Later, PEREZ stated, "You know what? I think somebody, somebody I know got a 38 Security Guard, you know what I'm saying?" CHS-1 stated, "Mmhmm, But is, but is it fresh out the box? That's the only way they taking it." PEREZ responded, "No, that, that one ain't fresh out the box." CHS-1 responded, "You see cause what happened is when I showed them the

box and I open it I've been taxing dudes like two bands." PEREZ responded, "Shit, get it. It's like the Taurus's I got, they didn't come in the case but they came in the box." CHS-1 responded, "Yeah, as long, as long." PEREZ stated, "They didn't come in the case, they brand new." CHS-1 stated, "And then you had the little, the little thing to clean it then you had the bro when I presented that, when I presented that the niggas were like yo how much you want for that yo? I was like, this is, this is brand new. The last one for 13, I unloaded that, I made a band off that." PEREZ responded, "Hell yeah." CHS-1 responded, "I mean, but the thing is if I'm driving all the way down there nigga. You feel me if I'm, nigga I'm driving all the way down there I'm taking the risk nigga, I'm doing, I'm doing everything so yeah you gotta pay that fee my nigga cause guess what you can't get it out here. You niggas wanna be naked out there?" PEREZ responded, "That's my shit like, the only reason I charge only a buck cause I'm going to Hartford to go get it but I'm still go to Hartford then I still gotta bring it back to Waterbury and if anything happens, I get pulled over, whatever that's my ass." CHS-1 responded, "You already know. So you said that you have two on deck right now, right?" PEREZ responded, "Yeah, I got these two but I'm, I'm supposed to call him in about a half hour cause California time is three hours behind so I'm gonna call him in a half hour, he gets out of work and then we gonna go over shit. As soon as we go over shit, I'll let you know, I'll send you pictures yo this is what on deck." Investigators reviewed the toll data and found that Target Telephone-3 (used by SOTO) contacted **Target Telephone-5** (used by PEREZ) the next day with a call duration of approximately five minutes.

41.     Later in the conversation PEREZ stated, "And I got the black talons in that shit. I don't give a fuck what you in my nigga. My shit going through that shit like butter." CHS-1 responded, "Hell yeah it is." PEREZ stated, "I got my AR, I got two AR-15s, one that came with

five 30 round clips and all the attachments, the other one that came with two hundred round drums."

42.     During the conversation, PEREZ also conveyed to CHS-1 that distributed narcotics. PEREZ stated, "I'm a coke boy to so." CHS-1 responded, "Yeah, how much you want them ounces for?" PEREZ responded, "Right now, I do the ounces for 11 uncut, untouched right off the key." CHS-1 responded, "Damn that's kinda pricey my boy. That is pricey though" PEREZ responded, "You could get it cheaper but you're gonna get it already stepped on." CHS-1 later advised investigators that at this point in the meeting, PEREZ showed him/her approximately 250 grams of cocaine, 250 grams of crack cocaine, and one pound of marijuana.

**C. Pre-Purchase Firearms Order: April 28, 2023**

43.     On April 28, 2023, CHS-1 received images (set forth below) from **Target Telephone-5** (used by PEREZ). After reviewing the photographs, investigators instructed CHS-1 to order the CZ Scorpion and three handguns. Subsequently, CHS-1 contacted PEREZ, using **Target Telephone-5**, and placed the order for the four firearms. Investigators reviewed the toll records and confirmed the contact occurred between CS-1 and **Target Telephone-5** (used by PEREZ).



### D. Controlled Firearms Purchase: May 3, 2023

44.     On May 1, 2023, investigators received information from the United States Postal Inspection Service (USPIS) that on May 1, 2023, two packages were mailed from Scott City, Kansas, to the address for Target Location-, the stash location, an address associated with DIAZ. One package weighed approximately 7 lbs. 14 oz. and the second package weighed approximately 9 lbs. 12 oz.

45.     On May 2, 2023, PEREZ, using **Target Telephone-5**, contacted CHS-1 and advised that he would be ready to conduct the firearms transaction the following day, May 3, 2023.

46.     Toll records for May 3, 2023, evidence contact and coordination between the GTO members prior to the delivery of the firearms to Target Location-3. More specifically, a review of telephone toll records for Target Location-4 (used by DIAZ) reveals that at 8:54 a.m.

on May 3, 2023, Target Location-4 (used by DIAZ) received an incoming call from Target

Location-3 (used by SOTO). The call between Target Location-4 and Target Location-3 lasted

approximately 28 seconds. At 09:12 a.m. on May 3, 2023, Target Location-4 received another

call from Target Location-5 (used by PEREZ). The call between Target Location-4 (used by

DIAZ) and Target Location-5 (used by PEREZ) lasted approximately 19 seconds.

47.     Prior to the controlled purchase on May 3, 2023, investigators initiated physical

and pole camera surveillance at Target Location-3 (the stash location) as well as at **Target**

**Location-2** (DIAZ's residence).

48.     At approximately 09:20 a.m. on May 3, 2023, surveillance units observed DIAZ

exiting the front door of **Target Location-2**. DIAZ walked to the corner of Whitmore Street and

looked down the road towards Target Location-3. Investigators noted that **Target Location-2**

and Target Location-3 are in close proximity to each other. DIAZ walked to a store across the

street then returned to **Target Location-2**. DIAZ was observed using a key to open the door

marked with the numerical address of **Target Location-2** and then entering the building.

49.     At approximately 9:29 a.m., investigators observed DIAZ exit the front entrance

of **Target Location-2** and proceed west on Bond Street. A silver Honda Accord was observed

exiting the rear parking area of **Target Location-2**. The same Honda was observed parking

across the street from Target Location-3. DIAZ exited the Honda Accord, walked towards Target

Location-3, and then walked behind Target Location-3. Despite the close distance between

**Target Location-2** and Target Location-3, DIAZ elected to drive his vehicle to Target Location-

3.

50.     At approximately 9:34 a.m., investigators observed DIAZ on the front porch of

Target Location-3. DIAZ checked the mailbox, retrieved mail from the box, and then walked

back towards the rear of the building. At approximately 10:05 a.m., short time later, a USPS mail truck parked in front of Target Location-3. DIAZ walked from the porch of Target Location-3 to the mail truck. DIAZ received two packages (one white box and one larger brown box) from the mail truck and entered the front door of Target Location-3 with the packages. At approximately 10:08 a.m., DIAZ exited the rear of Target Location-3 empty handed. Law enforcement observed DIAZ walk back to his vehicle and drive to **Target Location-2**. DIAZ utilized a key to open the door and entered his residence.

51.     Surveillance units observed that when DIAZ exited the rear of Target Location-3, he appeared to be on the phone. A review of the telephone toll records revealed that **Target Telephone-4** (used by DIAZ) placed a call to **Target Telephone-5** (used by PEREZ) at 10:08 a.m. Immediately thereafter, **Target Telephone-4** (used by DIAZ), placed a call to Target Telephone-3 (used by SOTO) at 10:08 a.m., which lasted 37 seconds. **Target Telephone-4** (used by DIAZ) then placed another call to Target Telephone-3 (used by SOTO) at 10:11 a.m., which lasted 2 minutes and 6 seconds.

52.     Toll records evidence that following DIAZ's departure from Target Location-3, the GTO members continued to coordinate with each other via cellular telephones. At 10:47 a.m. on May 3, 2023, **Target Telephone-4** (used by DIAZ) received a 4 second call from Target Telephone-3 (used by SOTO). At 10:55 a.m. on May 3, 2023, **Target Telephone-4** (used by DIAZ) received a call from **Target Telephone-5** (used by PEREZ) that lasted 2 seconds. At 10:56 a.m. on May 3, 2023, **Target Telephone-4** (used by DIAZ) received a call from **Target Telephone-5** (used by PEREZ) that lasted 4 seconds.

53.     Thereafter, surveillance observed Target Vehicle traveling south along Franklin Avenue at approximately 10:58 a.m. on May 3, 2023. Target Vehicle pulled into the rear parking

lot behind **Target Location-2**. A review of telephone toll records at this time revealed that

**Target Telephone-4** (used by DIAZ) missed a call from Target Vehicle 5 (used by PEREZ).

DIAZ was observed by surveillance units exiting the front of **Target Location-2** then walking to

the rear parking area and speaking with the driver of Target Vehicle, whom investigators were

able to later identify as PEREZ. DIAZ then entered the driver seat of a gray 2007 Infiniti

passenger car bearing Connecticut license plate AM54943. DIAZ and PEREZ then each drove in

their respective car from the parking lot of **Target Location-2**, and arrived moments later in

front of Target Location-3. PEREZ parked Target Vehicle in the rear of the driveway of Target

Location-3.

54.     Soon after, PEREZ and DIAZ were observed by surveillance units exiting the rear

of Target Location-3. PEREZ was in possession of two postal boxes that matched the description

of the ones DIAZ brought into Target Location-3 earlier in the day. PEREZ placed the boxes in

the trunk of Target Vehicle. One of the boxes in PEREZ's possession looked to have been

opened. PEREZ was observed handing DIAZ what appeared to be cash. DIAZ then went inside

the rear of Target Location-3. Soon after, DIAZ exited Target Location-3 then reentered the gray

Infinity he drove to Target Location-3 from **Target Location-2**. Both DIAZ and PEREZ then

left the area of Target Location-3. Surveillance units observed DIAZ return to the front of

**Target Location-2** then enter through the front door.

55.     Pursuant to the tracker warrant described in footnote 8 above, Target Vehicle

location was monitored remotely using the installed tracking device as he traveled from Harford,

Connecticut, to Naugatuck, Connecticut. While PEREZ was traveling, he did not appear to stop

for any significant amount of time between the locations. At approximately 11:17 a.m., **Target**

**Telephone-5** (used by PEREZ) called CHS-1 and instructed him/her that he was on the way to meet CHS-1.

56.     CHS-1 met with investigators at a secure location. His/her person and vehicle were searched for excess money and contraband with negative results. CHS-1 was equipped with an audio and video recorder and transmitter. CHS-1 was provided a specific amount of government funds to conduct the controlled purchase of the firearms. CHS-1 then departed the secure location. His/her route was monitored by investigators and by the audio and video transmitter.

57.     PEREZ arrived at the arranged meet location in Naugatuck, Connecticut at approximately 12:01 p.m. CHS-1 arrived a short time after. Upon arriving, PEREZ instructed CHS-1 to get inside Target Vehicle. CHS-1 entered Target Vehicle and then gave PEREZ an amount of government funds, which PEREZ counted. CHS-1 exited Target Vehicle, went to the trunk of the vehicle, and removed the white and brown packages that were consistent with the two packages DIAZ had retrieved from the USPS carrier and brought into Target Location-3 and the two packages PEREZ/DIAZ subsequently removed from Target Location-3. CHS-1 then went to the driver's window of Target Vehicle where PEREZ showed CHS-1 more photos of firearms on his phone. Thereafter, PEREZ and CHS-1 left the meeting location.

58.     A review of telephone toll records revealed that seconds after the transaction between CHS-1 and PEREZ was completed, **Target Telephone-5** (used by PEREZ) placed two calls to Target Telephone-3 (used by SOTO).

59.     CHS-1 met with investors at a secure location. Law enforcement followed the CHS-1 and he did not make any stops that were not requested by law enforcement. At the secure location, CHS-1 handed investigators the unused government funds, a white USPS box, and a

larger brown box. CHS-1's person and vehicle were searched for contraband or excess funds with negative results. Investigators opened the boxes. From inside the white USPS box, law enforcement recovered three (3) black plastic Glock boxes. Within each of the Glock boxes was a firearm. The three firearms were (1) a polymer 80 style handgun with no serial number (commonly referred to as a "Ghost Gun"), (2) a Glock model 17 with serial number BNRZ988, and (3) a Glock model 22 with serial number DGP572. From within the larger brown box, law enforcement recovered a CZ model Scorpion with serial number G066709 (the firearm not inside a Glock box in the photograph below). Investigators observed that several the mailing labels were ripped off of the packages.

60.     The CZ Scorpion with serial number G066709 pictured below was originally purchased by PICHARDO on April 26, 2023, from Top Guns LLC in Deerfield, Kansas. This was seven days prior to the recovery of the CZ. The two Glock firearms were purchased by Jennifer Baker, who is the spouse of BAKER, from Postrock Trading Company West located at 1203 North Taylor Avenue, Garden City, Kansas, on April 28, 2023. No trace information has been identified for the fourth firearm, the "Ghost Gun" polymer 80 style handgun with no serial number.



61.     Three of the four firearms obtained by CHS-1 during the controlled purchase on May 3, 2023, appear consistent to the descriptions of the photographs discussed above that PEREZ (via **Target Telephone-5**) sent to CHS-1 on April 28, 2023, whereby the CHS-1 effectively picked out which firearms CHS-1 wanted to purchase. Toll record information reflects that PEREZ was communicating with the other GTO members during the ordering process.

62.     More specifically, at 4:21 p.m. on April 28, 2023, **Target Telephone-5** (used by PEREZ) called Target Telephone-3 (used by SOTO) called for approximately 8-seconds. At 5:00 p.m., Target Telephone-3 (used by SOTO) called Target Telephone-2 (used by BAKER) for approximately one-minute and 14-seconds. At 5:02 p.m., Target Telephone-3 (used by SOTO) called **Target Telephone-5** (used by PEREZ) and the call lasted for 5-seconds. At 5:18 p.m. CHS-1 received photos of firearms for sale from **Target Telephone-5** (used by PEREZ). AT 7:04 p.m. PEREZ, using **Target Telephone-5**, sent text messages to CHS-1 confirming an order of firearms. At 7:19 p.m., Target Telephone-3 (used by SOTO) called **Target Telephone-5** (used by PEREZ) and the call lased approximately 20-minutes and 11-seconds. At 7:30 p.m., Target Telephone-3 (used by SOTO) called Target Telephone-2 (used by BAKER) and the call lasted 7-minutes and 16 seconds. At 7:43 p.m., CHS-1 received another photo of a firearm from **Target Telephone-5** (used by PEREZ). Given the timing of the exchanges between the GTO members, I believe that following the prebuy meeting on April 26, 2023, PEREZ spoke with SOTO (user of Target Telephone-3) about the firearms available for purchase. Thereafter, SOTO (user of Target Telephone-3) contacted BAKER, the broker in Kansas, to confirm the availability of firearms. SOTO (user of Target Telephone-3) then relayed this information to PEREZ who relayed the information to CHS-1, including the sending of photos of firearms for sale. Additionally, after

CHS-1 identified the firearms CHS-1 sought to purchase, this information was again relayed from PEREZ to SOTO (user of Target Telephone-3) to BAKER.

63.     Further, on the day of the controlled purchase (May 3, 2023), Target Telephone-3 (used by SOTO) had contact with Target Telephone-2 (used by BAKER) seven (7) times. Five (5) of those communications were during or immediately after the controlled purchase. On May 3, 2023, Target Telephone-2 (used by BAKER) and Target Telephone-1 (used by PICHARDO) had four (4) contacts.

64.     As detailed above, investigators received information on May 1, 2023, from the USPIS that two packages were mailed from Scott City, Kansas to Target Location-3 on May 1, 2023. One package weighed approximately 7 lbs. 14 oz. and the second package weighed approximately 9 lbs. 12 oz. Upon seizing the firearms and the USPS boxes via the controlled purchase, investigators weighed each box with the firearm(s) included. One of the packages weighed approximately 7 lbs. 14 oz. and the other package weighed approximately 9 lbs. 11 oz.

65.     Records received from USPIS revealed that one parcel with tracking number 9505 5116 2542 3121 2638 52 was mailed on May 1, 2023. The parcel was mailed from the Scott City Main Post Office located at 211 S Main Street, Scott City, KS 67871-9998 at approximately 10:12 a.m. (CDT) and paid for in cash. The parcel weighed approximately 7 lbs. 14 ounces. The parcel was delivered to Target Location-3 the day of the controlled purchase at approximately 10:05 a.m.

66.     Records received from USPIS revealed that one parcel with tracking number 9505 5116 2542 3121 2638 76 was mailed on May 1, 2023. The parcel was mailed from the Scott City Main Post Office at approximately 10:13 a.m. (CDT) and paid for in cash. The parcel weighed

approximately 9 lbs. 12 ounces. The parcel was delivered to Target Telephone-3 on the day of the controlled purchase at approximately 10:05 a.m.

67.     Information provided by USPIS relieved that two (2) IP addresses accessed the tracking information for both packages while in transit from Scott City, Kansas. Records obtained from Verizon revealed the IP addresses are subscribed to SOTO at Target Location-6 (minus the apartment number).

**E.  Pre-Purchase Contact: May 6, 2023, through May 8, 2023**

68.     On May 6, 2023, three days following the controlled purchase described above, CHS-1 advised investigators that he/she received a phone call from PEREZ, using **Target Telephone-5** that day. CHS-1 reported that during this phone call, PEREZ told CHS-1 that he just got off a conference call with his gun "connects" in California and Kansas. PEREZ told CHS-1 that he would send him/her photos of more guns that are available once either the Kansas or California people get back to him. Toll register information supports the belief that PEREZ's gun "connect" in California is SOTO (user of Target Telephone-3) and that his gun "connect" in Kansas is BAKER (user of Target Telephone-2).

69.     More specifically, toll data evidence contact between SOTO (user of Target Telephone- E 3), PEREZ (user of **Target Telephone-5**, and BAKER (user of Target Telephone-2) shortly before PEREZ's call to CHS-1 on May 6, 2023. At 6:20 p.m. **Target Telephone-5** (used by PEREZ) called to Target Telephone-3 (used by SOTO). Immediately thereafter at 6:24 p.m. Target Telephone-2 (used by BAKER) called Target Telephone-3 (used by SOTO). Just after these two phone calls, a "Three Way Call" occurred.[9] **Target Telephone-5** (used by

---

[9] The toll data reflects only that a three-way call occurred. It does not associate telephone numbers with the event.

PEREZ) thereafter called CHS-1 at 6:37 p.m. and made representations regarding communications with his gun connects. Given the timing of these communications, I believe that when PEREZ indicated that he had gun "connects" in California and Kansas he was referring to BAKER in Kansas and SOTO in California, and that he communicated with BAKER and SOTO in connection to his offer to provide photos of additional firearms for sale.

70.    On May 7, 2023, **Target Telephone-5** (used by PEREZ) contacted CHS-1 and sent the firearm images below. **Target Telephone-5** (used by PEREZ) messaged CHS-1, "I just need to know which big one you want so I can place the rest of the order."



71.    On May 8, 2023, at approximately 7:30 p.m., CHS-1 contacted investigators and advised that he/she had just spoken with PEREZ (user of **Target Telephone-5**) about ordering additional firearms. PEREZ advised CHS-1 that he would send him/her photographs of firearms available for order. Subsequently, CHS-1 received the below photographs from PEREZ.



72.    Analysis of pen register data revealed that **Target Telephone-5** (used by PEREZ)

shows that **Target Telephone-5** and Target Telephone-3 (used by SOTO) spoke moments before

PEREZ sent CHS-1 the photo depicted above at approximately 7:30 p.m. More specifically, the

pen register data shows that **Target Telephone-5** received an incoming call from Target

Telephone-3 at 7:23 p.m. and the call lasted approximately 1 minute and 20 seconds.

73.    Additional pen register data thereafter reflects contact between Target Telephone-

3 (used by SOTO), Target Telephone-2 (used by BAKER) and then **Target Telephone-5** (used

by PEREZ). More specifically, Target Telephone-3 (used by SOTO) placed an outgoing call to

Target Telephone-2 (used by BAKER) and that call lasted approximately 2 minutes and 9

seconds. **Target Telephone-5** (used by PEREZ) placed an outgoing call to CHS-1 at 7:27 p.m.

with a duration of 20 seconds. Approximately one minute later, **Target Telephone-5** (used by

PEREZ) received an incoming call from Target Telephone-3 (used by SOTO) with a duration of

1 minute and 6 seconds. **Target Telephone-5** (used by PEREZ) received an incoming call from CHS-1 at 7:30 p.m. with a duration of 58 seconds then another call from CHS-1 at 7:42 p.m. with a duration of 1 minute and 55 seconds. **Target Telephone-5** (used by PEREZ) received an incoming call from Target Telephone-3 (used by SOTO) at 7:50 p.m. with a duration of 41 seconds. Given the timing of these communications, I believe PEREZ (using **Target Telephone-5**) communicated with SOTO (using Target Telephone-3) who communicated with BAKER (using Target Telephone-2) to coordinate the firearm photos sent by PEREZ (using **Target Telephone-5**) to CHS-1.

**F.  Controlled Firearms Purchase: May 11, 2023**

74.    On May 9, 2023, investigators received information from USPIS that on May 9, 2023, two packages were mailed from Scott City, Kansas, to Target Location-3. One package weighed 7 lbs. 10 oz. and the second package weighed approximately 13 lbs. 5 oz.

75.    Investigators conducted a toll analysis on the Target Telephones around the time the packages were shipped from Scott City, Kansas. According to USPIS, the packages were shipped from Kansas at approximately 9:30 a.m. on May 9, 2023. On May 8, 2023, Target Telephone-3 (used by SOTO) contacted **Target Telephone-5** (used by PEREZ) at 7:23 p.m. for 1 minute and 28 seconds.  At approximately 7:25 p.m., Target Telephone-3 (used by SOTO) contacted Target Telephone-2 (used by BAKER) for 2 minutes and 9 seconds. At 7:28 p.m., Target Telephone-3 (used by SOTO) contacted **Target Telephone-5** (used by PEREZ) for 1 minute and 11 seconds. At 7:50 p.m., Target Telephone-3 (used by SOTO) contacted **Target Telephone-5** (used by PEREZ) for 48 seconds. On May 9, 2023, at 7:45 a.m., Target Telephone-3 (used by SOTO) contacted **Target Telephone-5** (used by PEREZ) for 31 seconds. At 9:38 a.m., Target Telephone-3 (used by SOTO) contacted **Target Telephone-4** (used by DIAZ) for 2

minutes and 25 seconds. At 12:56 p.m., Target Telephone-3 (used by SOTO) contacted **Target Telephone-5** (used by PEREZ) for 1 minute and 15 seconds.

76.     On May 10, 2023, PEREZ, using **Target Telephone-5**, contacted CHS-1 and advised that he would be ready to conduct the firearms transaction on May 11, 2023. As a result, investigators met with CHS-1 to conduct a controlled firearms purchase from PEREZ utilizing telephone number 860-672-8243, **Target Telephone-5**.

77.     Prior to the controlled purchase, investigators initiated physical and pole camera surveillance at Target Location-3 (stash location) as well as at **Target Location-2** (DIAZ's residence).

78.     On May 11, 2023, at approximately 09:13 a.m., surveillance units observed DIAZ walk up to Target Location-3 and walked towards the rear of the residence. A short time later, DIAZ exited Target Location-3 and entered a Honda passenger car and drove away. At approximately 9:44 a.m., DIAZ and an unknown female walked up to the front porch of Target Location-3. DIAZ walked into the front door of Target Location-3 while the female remained outside. DIAZ came back outside a few moments later. At 10:03 a.m., a USPS mail courier placed mail inside the mailbox of Target Location-3. DIAZ took the mail out of the box.

79.     At approximately 10:19 a.m., the courier returned carrying a rectangular brown box. The courier handed the box to DIAZ. The two appeared to have a conversation before the courier departed the area. DIAZ then re-entered Target Location-3.

80.     At this point in the surveillance, USPSIS informed investigators that only one of the two packages mailed from Scott City, Kansas, on May 9, 2023, were out for delivery on May 11, 2023. The other package was delayed while in transit to its destination.

81.     At 10:29 a.m., DIAZ exited Target Location-3 and walked towards the direction that the mail truck while it was parked on Whitmore Street. Surveillance units noted that DIAZ appeared to be on the phone and walking quickly as if in a panic. According to pen register data, DIAZ appeared to be utilizing **Target Telephone-4** and was contacted by Target Telephone-3 (used by SOTO) at 10:28 a.m. for 3 minutes and 25 seconds. See graph of phone activity from the day below.

| From | To | Time | Duration |
|------|------|---------|----------|
| CHS | TT5 | 8:57 AM | 1.57 |
| Package missing | | 10:19 AM | |
| TT3 | TT4 | 10:28 AM | 3.31 |
| TT3 | TT2 | 10:31 AM | 1.57 |
| TT3 | TT5 | 10:33 AM | 1.48 |
| TT4 | TT3 | 10:35 AM | 2.01 |
| TT5 | TT3 | 10:40 AM | 2.39 |
| TT5 | TT4 | 10:43 AM | 1.38 |
| TT5 | CHS | 10:45 AM | 1.55 |
| TT5 | TT4 | 10:47 AM | 2.58 |
| TT5 | TT4 | 10:58 AM | 0.19 |
| TT2 | TT3 | 11:33 AM | 3.19 |
| TT4 | TT2 | 11:36 AM | 0.02 |
| TT3 | TT4 | 11:36 AM | 4.30 |
| TT4 | TT5 | 11:36 AM | 0.10 |
| TT3 | TT2 | 11:44 AM | 4.03 |
| TT5 | CHS | 11:46 AM | 3.25 |
| TT3 | TT4 | 11:49 AM | 1.25 |
| TT5 | TT4 | 11:50 AM | 0.26 |
| TT4 | TT3 | 11:51 AM | 4.57 |
| TT2 | TT3 | 11:56 AM | 0.02 |
| TT3 | TT5 | 12:25 PM | 1.08 |
| TT5 | CHS | 12:27 PM | 0.37 |
| TT4 | TT3 | 12:47 PM | 1.11 |
| TT3 | TT4 | 12:50 PM | 0.24 |
| TT3 | USPS | 12:53 PM | 10.10 |
| TT3 | TT4 | 1:03 PM | 0.59 |
| TT3 | TT5 | 1:04 PM | 0.37 |
| TT5 | CHS | 1:16 PM | 1.33 |

| TT5 | TT4 | 1:17 PM | 0.18 |
| TT4 | TT5 | 1:18 PM | 1.12 |
| TT4 | TT3 | 1:51 PM | 1.12 |
| TT4 | TT5 | 1:52 PM | 0.37 |
| TT4 | TT3 | 1:53 PM | 0.35 |

82.    At 10:33 a.m., DIAZ returned to Target Location-3. DIAZ was observed talking on the phone. DIAZ entered Target Location-3 soon after and then exited with the unidentified female. Neither were not in possession of a package. DIAZ appeared to be speaking on the phone. DIAZ and the female walked to **Target Location-2** and entered the building. At 10:58 a.m., DIAZ exited **Target Location-2** and walked to the parking lot at the rear of the building. DIAZ drove the same silver Honda to Target Location-3 and parked.

83.    Investigators monitoring the vehicle mounted GPS on Target Vehicle observed that it left the area of **Target Location-1** and started to travel toward Hartford at approximately 11:09 a.m. Target Vehicle arrived at Target Location-3 at approximately 11:36 a.m. During its travel, it did not appear that Target Vehicle stopped at any location for any significant amount of time. Target Vehicle parked in the rear parking area of Target Location-3.

84.    DIAZ exited the Honda and walked behind Target Location-3 while on the phone. DIAZ walked up to Target Vehicle and handed his cell phone to the driver of Target Vehicle, who was identified as PEREZ. A review of pen register data at this point revealed that Target Telephone-3 was in contact with **Target Telephone-4**. PEREZ exited Target Vehicle. PEREZ and DIAZ then entered Target Location-3 through the front door. They were inside Target Location-3 for approximately four minutes. DIAZ and PEREZ exited the rear of Target Location-3. PEREZ was carrying the brown package that had been delivered earlier than morning under ninety-minutes beforehand. Surveillance units indicated that the package looked to have been opened. PEREZ placed the package in the trunk of Target Vehicle. PEREZ

departed the area at approximately 11:45 a.m. DIAZ walked to and entered the Honda. DIAZ

drove back to **Target Location-2**. DIAZ walked into the location and utilized a key to make

entry.

85.　　At approximately 11:46 a.m., CHS-1 received a call from PEREZ. PEREZ told

CHS-1 that he wanted CHS-1 to go to **Target Location-7** for the transaction. Investigators met

with CHS-1 at a safe location. CHS-1 and his/her vehicle were searched for contraband and

excess money with negative results. CHS-1 was provided with funds for the purchase and

audio/video recording equipment. CHS-1 departed the secure location while being monitored by

investigators. CHS-1 made a stop at a local store to purchase a drink. A review of the

audio/video equipment confirmed this event.

86.　　PEREZ arrived at **Target Location-7** and parked in the front parking lot at 12:26

p.m. It did not appear that PEREZ stopped at any other location for any significant amount of

time while he travelled to **Target Location-7**. CHS-1 arrived at **Target Location-7** at 12:27

p.m. CHS-1 exited his/her vehicle and got into Target Vehicle.

87.　　At 12:45 p.m., CHS-1 exited Target Vehicle and went to Target Vehicle's trunk.

CHS-1 removed the brown package and placed it in their own vehicle. CHS-1 then his/her

vehicle and departed the area. PEREZ then moved Target Vehicle to a parking spot closer to the

front of **Target Location-7**. PEREZ exited Target Vehicle and entered **Target Location-7** for at

least twenty-four minutes.

88.　　CHS-1 returned to the secure location. His/her route was again monitored by

surveillance units and the audio/video device. CHS-1 did not make any detours. At this location,

investigators took custody of the package and CHS-1 returned the unused funds. CHS-1 and

his/her vehicle were searched for contraband with negative results.

89.     Investigators noted that the package was opened at one end. There were labels on

the package which were addressed to, "Angelo Diaz [at the address for Target Location-3]." The

return address was "Tommy J Scott City KS 67871."



90.     Two firearms wrapped in bubble wrap and aluminum foil were inside the box.

One firearm was a CZ model Scorpion 9mm bearing serial number G159954. The other firearm

was a Del-Ton model DTI-15 5.56 caliber rifle bearing serial number S259413. A review of ATF

records revealed that the CZ was purchased by PICHARDO on May 8, 2023, from Top Guns in

Deerfield, Kansas, three (3) days prior to this controlled purchase.





91.     After debriefing CHS-1, and listening to the audio/video equipment, the following conversation of note was captured:

92.     A review of the audio video recording device worn by CHS-1 during the controlled purchase on May 11, 2023, detailed above revealed the following statements made by CHS-1 and PEREZ during the meeting. During the meeting, CHS-1 indicated that he/she was a convicted felon. CHS-1 stated, "And I just quit my job, I'm trying to get another job my nigga. That shit hard as hell like being a felon." Later, CHS-1 stated, "I went to Amazon, right? Because I'm a convicted felon." PEREZ responded, "You can't be a driver, but you can work in the warehouse."

93.     Later in the conversation PEREZ stated, "Me, you know I've been a Latin King 31 years but I'm a (unintelligible) I'm a terminator, I'm different. We're not Terminators no more. We grim now. You know what I'm saying cause the feds and all that shit so we had to switch up the name." I know, the Latin Kings are a violent international street gang that was originally formed in Chicago in the mid-1960s by individuals who had immigrated from Puerto Rico. The gang expanded significantly in the following decades. The Latin Kings are highly organized, and gang leadership exists at the national, regional, and local levels. Membership is governed by a written manifesto and constitution with established rules and by-laws. Search warrants resulting from other investigations into members of the Latin Kings have resulted in seizures of this written document, as well as other indicia of gang membership and the formal gang structure. The Latin Kings have a "National Salute," a "Kings and Queens Prayer," a "Code of Kingism," and a "Code of Conduct," among numerous other formalities. Latin Kings chapters have been identified in more than thirty states, including Connecticut, as well as in numerous other countries. Local chapters regularly hold meetings to discuss gang activity, to enforce gang rules, and to collect money for gang activity or for incarcerated Latin Kings members. Gang identifiers include a five- or three-pointed crown, a lion wearing a crown, the letters "LK", the phrase "Amor de Rey" or "ADR", the phrase "Amor de Corona" or "ADC", and others. The gang's primary colors are black and gold/yellow or, in some chapters, red and green.

94.     Later in the conversation CHS-1 asked, "How much, how much I owe you?" PEREZ responded, "59 Papi." CHS-1 responded, "59." PEREZ stated, "I told you since he was gonna take a buck off, I'll take a buck off." CHS-1 stated, "Hold on Ima give you big bills, but, I'm, I'm, I'm ready." PEREZ stated, "Yeah, yeah." CHS-1 states, "Even though, even though it's all gonna go to you." PEREZ stated, "Yeah, if that shit got here this afternoon, perfect. If not,

worst case scenario probably got you tomorrow." Later, PEREZ stated, "He's at the house waiting right now, that's why that's gonna, I already paid him a buck fifty to accept shit." I believe that when PEREZ stated, "He's at the house waiting right now" and "I already paid him a buck fifty" it was a reference to PEREZ paying DIAZ $150 to wait at Target Location-3 to accept the USPS package which contained firearms.

95.     Later in the conversation PEREZ stated, "I opened that box." CHS-1 responded, "You straight." Later, PEREZ stated, "Remember these cameras here, don't worry about them my wife is a manager in here so we control the cameras." I believe that PEREZ insinuated that they were safe to conduct illegal activities at the laundry mat (**Target Location-7**) because his wife had control of the cameras.

96.     A review of the toll records and pen register data on May 11, 2023, revealed contact between members of the GTO at an increased volume because of the package of firearms that was not delivered at the expected date and time. As detailed in the graph below, toll records and Pen Register data revealed contact between **Target Telephone-5** (used by PEREZ), **Target Telephone-4** (used by DIAZ), Target Telephone-3 (used by SOTO), and Target Telephone-2 (used by BAKER) within a close timeframe. As detailed above, DIAZ was handed one box by the USPS courier. I believe, that because two packages were expected to delivered, SOTO contacted DIAZ to inquire about the status of the missing package. Given the timing of the communications, as well as other evidence such as how a device utilizing IP addresses associated with SOTO checked the packages shipped from Scott City, Kansas, ultimately delivered to Connecticut and purchased on May 3, 2023, I believe that SOTO handles the logistics of arranging for the shipping and receiving firearms on behalf of the GTO. A review of the pen register data for May 11, 2023, revealed a three minute and 31 second duration call between

Target Telephone-3 (used by SOTO) and **Target Telephone-4** (used by DIAZ) at 10:28 a.m., immediately followed by an approximately two-minute call between Target Telephone-3 (used by SOTO) and Target Telephone-2 (used by BAKER). Investigators believe that BAKER or someone on behalf of BAKER shipped the firearms from Scott City to Target Location-3. Immediately following the call between Target Telephone-3 (used by SOTO) and Target Telephone-2 (used by BAKER), Target Telephone-3 (used by SOTO) placed an outgoing call to **Target Telephone-5** (used by PEREZ) at 10:33 a.m. with an approximate one minute and 48 second call duration. I believe that SOTO contacted PEREZ to update him on the status of the firearms delivery to Target Location-3.

97.     Later on, May 11, 2023, Target Telephone-3 (used by SOTO) placed a call to a phone number associated with the USPS. Upon answering, the USPS employee asked for the name of the caller. A male voice believed to be Fernando SOTO stated, "Fernando [pause] Diaz". I believe that SOTO attempted to hide his true identity by indicating that his last name was DIAZ rather than SOTO. When asked the reason for the call, the male voice believed to be SOTO stated, "I'm, you know I sent this package and one got there already and the second one is not even showing up for delivery. It's I don't know what's going on, I'm trying to figure it out." The caller of Target Telephone-3 was asked to confirm the address the package was supposed to be shipped to. In response, the male believed to be SOTO stated, "66 Whitmore Street, second floor, Hartford Connecticut 06114". Immediately following the call between Target Telephone-3 (used by SOTO) and the USPS, pen register data revealed an approximate one-minute call at 1:03 p.m. from Target Telephone-3 (used by Soto) to **Target Telephone-4** (used by DIAZ). Immediately after, an approximate 37 second call from Target Telephone-3 (used by SOTO) to **Target Telephone-5** (used by PEREZ) occurred at 1:04 p.m. Given such communications and

the timing of such communications, I believe that upon receiving the updated information from the USPS employee about the shipment of the missing package containing firearms, SOTO contacted DIAZ and PEREZ to update them that the firearms would likely arrive the following day. Pen register data on May 11, 2023, revealed approximately 27 contacts between members of the GTO, specifically Target Telephone-2 (used by Baker), Target Telephone-3 (used by SOTO), **Target Telephone-4** (used by DIAZ), and **Target Telephone-5** (used by PEREZ) between 10:28 a.m.  and 1:53 p.m.

### G. Controlled Firearms Purchase: May 12, 2023

98.     On May 12, 2023, at 10:23 a.m. PEREZ, using **Target Telephone-5**, contacted CHS-1 and advised that he would be ready to conduct the firearms transaction on May 12, 2023.

99.     On May 12, 2023, investigators received information from the USPIS that the second package, which did not arrive on May 11, 2023, was scheduled to be delivered to Target Location-3, on May 12, 2023. This package weighed approximately 7 lbs. 10 oz.

100.    Prior to the controlled purchase, investigators initiated physical and pole camera surveillance at Target Location-3, **Target Location-7**, and **Target Location-2**.

101.    At approximately 09:30 a.m., on May 12, 2023, surveillance units observed DIAZ walk up to Target Location-3. At approximately 9:58 a.m., DIAZ walked over to a mail truck and was handed a white package. DIAZ took the package into Target Location-3 utilizing the front door. DIAZ exited the front door a short time later and walked away.  At approximately 10:23 a.m., CHS-1 received a call from **Target Telephone-5** (used by PEREZ). CHS-1 reported PEREZ wanted to meet before he made a trip to Hartford in order to get the payment for the transaction. This would avoid making two (2) trips according to PEREZ.

102.     At approximately 11:15 a.m., while monitoring the vehicle mounted GPS, investigators were able to see Target Vehicle depart the area of **Target Location-1**. Target Vehicle drove to a coffee shop a short distance away, then started to drive towards **Target Location-7**. Target Vehicle arrived at **Target Location-7** at approximately 11:37 a.m.

103.     Investigators met with CHS-1 at a safe location. CHS-1 and his/her vehicle were searched for contraband and excess money with negative results. CHS-1 was provided with funds for the purchase and audio/video recording equipment. CHS-1 departed the secure location while being monitored by investigators. Investigators confirmed via the audio-video equipment that CHS-1 did not make any stops or detours.

104.     At 11:45 a.m., CHS-1 arrived at **Target Location-7** and met with PEREZ, who was the driver of Target Vehicle. Perez was the only occupant in the Target Vehicle. CHS-1 got into Target Vehicle. After several moments in the vehicle, a Waterbury Police Detective called CHS-1 posing as a potential narcotics customer of CHS-1. CHS-1 did not place his/her phone on speaker, but PEREZ overheard CHS-1's portion of the conversation with the Detective. The Detective asked CHS-1 for "1" indicating that he was attempting to purchase one ounce of cocaine. CHS-1 told the Detective that he was "dry" meaning that he/she did not have any drugs to sell.

105.     After the conversation ended, PEREZ offered, without provocation, to sell CHS-1 one (1) ounce of crack cocaine for $1,100. Further, PEREZ told CHS-1 that he had "both" on him right now. CHS-1 took PEREZ's statement to mean that PEREZ had both powder cocaine and crack cocaine available for purchase. CHS-1 purchased the ounce of crack cocaine from PEREZ. CHS-1 reported that PEREZ had a large quantity of cocaine in Target Vehicle at this time. PEREZ made mention that if he were to be robbed, he had "Heckle and Jeckle" in Target

Vehicle with him. In the previous conversations with PEREZ and CHS-1, CHS-1 indicated that

"HECKLE and JECKLE" were PEREZ's 1911 style handguns.

106.    After debriefing CHS-1, and listening to the audio/video equipment, the following

conversation of note occurred during the meeting between CHS-1 and PEREZ:

> [CHS-1 on the phone with a Waterbury Police Detective- "You need one? I'm dry right
> now pa. Yeah I'll let you know I I'll let you know let me see if I can find something off
> off my boy man but their dry right now man. I'll call you back. Aight."] Call ended.
> CHS-1: This nigga wants an ounce man I'm dry as fuck.
> PEREZ:  UI
> CHS-1: Huh
> PEREZ: What's he want?
> CHS-1: Coke or crack cuz I cook it.
> PEREZ: What you chargein?
> CHS-1: I charge him 14.
> PEREZ: Damn (UI.)
> CHS-1: I charge him 14 so I get it for a band though.
> PEREZ: I can give it to you for 11. You still got 3.
> CHS-1: 11? Let me go see.
> PEREZ: I got both right now. [ . . . ]
> CHS-1: If your shit ever goes missing or stolen you da only mother fucker out here that
> got that shit.
> PEREZ: That shit is as far as my shit going missing or stolen I I (UI) you didn't see
> Heckle and Jeckle huh?
> CHS-1: Nah
> PEREZ: Let me show you Heckle and Jeckle in a second.
> CHS-1: Oh yeah yeah yeah yeah yeah with the scope and everything (ui).
> PEREZ: My two 45s is my babies.

107.    CHS-1 provided PEREZ with funds for the purchase of both the crack cocaine

and the firearms. In exchange, CHS-1 received a reddish-rock like substance wrapped in plastic

wrap that was later determined to weigh approximately 29.5 gross grams (pictured below). At

approximately 12:11 p.m., CHS-1 and PEREZ parted ways. PEREZ told CHS-1 that he should

be back in a little over an hour.



108.    CHS-1 returned to the secure location. His/her route was again monitored by surveillance units and the audio/video device. At this location, investigators took custody of the suspected crack cocaine. CHS-1 returned the unused funds. CHS-1 and his/her vehicle were searched for contraband with negative results. A field test was conducted on a portion of the suspected crack cocaine and it returned a positive reaction indicating the presence of cocaine.

109.    Following the exchange between CHS-1 and PEREZ, investigators monitored the vehicle mounted GPS on Target Vehicle as it drove to Hartford. PEREZ arrived at Target Location-3 at approximately 12:51 p.m. It did not appear that PEREZ stopped for any significant amount of time while traveling to Hartford from **Target Location-7**. At around 1:00 p.m., DIAZ walked around the rear of Target Location-3 and Target Vehicle pulled into the rear parking area. PEREZ exited Target Vehicle and both he and DIAZ entered the rear door of Target Location-3. Surveillance units on scene noted that they could see DIAZ and PEREZ through a second-floor window. Minutes later, both men exited the rear door again. PEREZ was carrying a white package that appeared to be still closed. PEREZ looked as if he gave DIAZ an amount of money before entering Target Vehicle. PEREZ left Target Location-3 at approximately 1:07 p.m.

110.    Investigators monitored the route of Target Vehicle as it traveled back to **Target Location-7**. It did not appear it stopped for any significant amount of time while travelling back to **Target Location-7**. Investigators met with CHS-1 again at a safe location. CHS-1 and his/her vehicle were searched for contraband and excess money with negative results. CHS-1 was provided with the audio/video recording equipment. CHS-1 departed the secure location while being monitored by investigators. Investigators confirmed via the audio-video equipment that CHS-1 did not make any stops or detours.

111.    PEREZ arrived at **Target Location-7** at approximately 1:55 p.m. CHS-1 arrived soon after. CHS-1 walked up Target Vehicle and retrieved the white package from the truck. CHS-1 then departed. PEREZ entered **Target Location-7** for a few moments then exited and left the area in Target Vehicle.

112.    CHS-1 returned to the secure location. His/her route was again monitored by surveillance units and the audio/video device. CHS-1 did not make any detours. At this location, investigators took custody of the white package. CHS-1 and his/her vehicle were searched for contraband with negative results.

113.    Investigators noted that the package was sealed. There were labels on the package which were addressed to, "Angelo Diaz [at the address for Target Location-3]." The return address was "Tommy J Scott City KS 67871.".



114.    Inside the box were three (3) firearms wrapped in bubble wrap and aluminum foil. One firearm was a Springfield Armory model Hellcat, 9mm, bearing serial number BB280162. One firearm was a Glock model 27, .40 caliber, bearing serial number BCTE168. One firearm was a Ruger model SR1911, .45 caliber, bearing serial number 673-70700.[10] Investigators weighted the package with the firearms inside, and determined that the package received by CHS-1 weighted approximately 7 lbs. 9.5 oz.

---

[10] Law enforcement is currently waiting for the trace information pertaining to these firearms.





115.    The graph below depicts phone contact between the GTO members at the times surrounding the events discussed above.

| From | To | Time | Duration |
|------|------|------|----------|
| TT3 | TT4 | 7:42 AM | 27.27 |
| TT4 | TT3 | 8:10 AM | 0.18 |
| TT2 | TT3 | 8:14 AM | 9.15 |
| Package Delivered | | 9:58 AM | |
| TT4 | TT3 | 9:59 AM | 0.37 |
| TT3 | TT5 | 10:00 AM | 4.18 |
| TT3 | TT4 | 10:04 AM | 1.06 |
| TT5 | TT4 | 10:20 AM | 1.24 |
| TT5 | CHS | 10:30 AM | 1.08 |
| TT3 | TT4 | 11:58 AM | 6.18 |
| TT3 | TT5 | 12:03 PM | 1.14 |
| TT5 | TT4 | 12:49 PM | 0.22 |
| PEREZ AT TL3 | | 1:00 PM | |
| PEREZ LEFT TL3 | | 1:07 PM | |
| TT4 | TT3 | 1:11 PM | 0.35 |
| TT5 | CHS | 1:30 PM | 0.13 |
| TT3 | TT4 | 1:41 PM | 2.08 |
| CHS | TT5 | 1:53 PM | 0.11 |
| PEREZ AT TL7 W/CHS | | 1:58 PM | |
| TT4 | TT3 | 3:05 PM | 1.33 |
| TT3 | TT2 | 3:07 PM | 2.55 |

## H. Knew or Had Reasonable Cause to Believe that Use, Carrying, Possession, and/or Receipt Would Constitute a Felony

116.     PEREZ did not complete the transfer paperwork any of the nine (9) firearms sold to CHS-1 or ask CHS-1 to sign a receipt for the firearms connection to the three controlled purchases of firearms discussed herein, which is a violation of Connecticut General Statutes § 29-33(c), (e) (documentation requirements for private firearm transfers) and a Class C felony under state law (Conn. Gen. Stat. § 29-33(i)).

117.     PEREZ was also informed by CHS-1 that CHS-1 was a felon, making the transfer of any firearm by PEREZ to CHS-1 a felony under federal law, punishable by up to fifteen years imprisonment. 18 U.S.C. §§ 922(d), 924(a)(8).

118.     In connection to the three controlled firearm purchases, PEREZ transported the firearms in Target Vehicle, and given the manner in which the firearms were received via the

mail and quickly transported for resale, there is probable cause to believe such transportation was in violation of Connecticut General Statutes § 29-38 (weapon in vehicle) and a Class D felony under state law (Conn. Gen. Stat. § 29-38(a)). DIAZ, who was present at the time PEREZ placed the firearms inside his vehicle, was aware or should have been aware that PEREZ upon receiving the firearms, PEREZ would be transporting such firearms in a vehicle.

119.    Given the delivery of the firearms to Target Location 3 via the USPS, the transfer of the firearms while still within the shipping boxes, and the telephone contact between the GTO members around the times of the package shipments and delivery, DIAZ and PEREZ both knew or had reasonable cause to believe that the receipt of the firearms via the mail was in violation of federal law, 18 U.S.C. § 1715 (firearms as nonmailable), a felony punishable by up to two years imprisonment.

120.    One of the firearms received and conveyed by PEREZ and DIAZ, a Del-Ton DTI-15 bearing serial number S259413, is illegal to purchase or possess in Connecticut under Connecticut General Statutes § 53-202b(a)(1) (sale or transfer of an assault weapon) and such possession is a Class C felony under state law.[11]

121.    Another one of firearms received and conveyed by PEREZ and DIAZ, a firearm without a serial number or identified marking, commonly referred to as a "Ghost Gun," is illegal to possess in Connecticut under Connecticut General Statutes § 53-206i (manufacture of firearm from polymer plastic without detectible security exemplar) and such possession is a Class C felony under state law. Conn. Gen. Stat. § 53-206i(a), (c).

---

[11] Law enforcement is waiting for the trace information pertaining to this firearm.

122.     PICHARDO, by purchasing the firearms trafficked as a straw purchaser, knows or has reason to know that the firearms will be resold, and possessed/sold/transferred in violation of state or federal law. Given his communications with BAKER in connection to the purchase of one such firearm in Connecticut on May 3, 2023, as well as the communications connected to the shipment of additional parcels believed to contain firearms, it is further believed that PICHARDO is conspiracy with his coconspirators, including PEREZ and DIAZ based in Connecticut, to traffic firearms.

**I.   Additional Historic Toll Analysis**

123.     A review of telephone toll records between February 6, 2023, through May 8, 2023, revealed 505 contacts between Target Telephone-1 (used by PICHARDO) and Target Telephone-2 (used by BAKER). A review of telephone toll records within the same date range revealed 317 contacts between Target Telephone-2 (used by BAKER) and Target Telephone-3 (used by SOTO). A review of toll records between March 23, 2023, through April 17, 2023, revealed 519 contacts between Target Telephone-1 (used by PICHARDO) and a telephone number ending in 7733, a phone number associated with Timothy CLEER, the owner of Top Guns LLC located in Deerfield, Kansas. Given the shipments of the firearms described above, the photos of firearms available to purchase, and the phone contact between the parties, I believe that BAKER (Target Telephone-2) purchases firearms from PICHARDO (Target Telephone-1) and that they utilize their respective cellular telephones in connection to such activities. I further believe that PICHARDO purchases firearms from Top Guns LLC which he then resells such firearms on behalf of the GTO.

## J.  Firearm Purchases

124.    Between August 12, 2020, through May 3, 2023, PICHARDO purchased at least 73 firearms. Data base information reveals that all of the firearms were purchased from "Top Guns LLC" or "Tops Guns." To date, of the 73 firearms purchased by PICHARDO, six firearms have been recovered by law enforcement in San Bernadino, California; Detroit, Michigan; Waterbury, Connecticut; and Naugatuck, Connecticut. A firearm purchased by PICHARDO on July 3, 2022, was recovered by law enforcement in San Bernardino, California at the scene of the homicide of a juvenile on August 27, 2022. Further, the firearm transactions identified as purchased by PICHARDO to date are from reports pertaining to the sale of multiple firearms at the same time, and thus, it is unknown at this time whether PICHARDO has purchased additional firearms.[12]

## K.  Information from Cooperating Defendant

125.    In January 2023, HIS in Detroit, MI, conducted an interview of a cooperating defendant (hereafter referred to as "CD-1") who was arrested after attempting to smuggle three firearms into Canada from the United States. Two of the three firearms were purchased by PICHARDO three days prior at Top Guns LLC.

126.    CD-1 stated he traveled from Canada to Kansas and met with a man he knew as "Ramon." CD-1 said he communicated with Ramon over WhatsApp. Ramon sold him five handguns. CD-1 said he paid Ramon $1,800 for two of the firearms. CD-1 gave two of the handguns to a person near the Mexican American border named "Dave." CD-1 asserted that Dave had previously paid Ramon for the firearms. CD-1 said he was supposed to give Dave

---

[12] We have yet to request the paperwork from "Top Guns LLC" or "Tops Guns" due to the covert nature of the investigation. As a result, we have only reviewed paperwork pertaining to the sales of multiple firearms.

three handguns but forgot to give him one. CD-1 then drove back to the Canadian border where he was arrested for attempting to cross into the country with the remaining three firearms of the five firearms CD-1 purchased from Ramon.[13] CD-1 described Ramon as a Hispanic male who drove an older red pickup truck. A review of a database revealed PICHARDO owned a 2001 red F-150 truck.

127.    As a result of CD-1's arrest, his phone was seized. A search warrant was obtained by HSI, and as a result multiple WhatsApp conversations were located. These conversations were in Spanish and were translated by HSI analysts. A summary of the conversations are as follows:

128.    In October 2022, in a conversion with an individual believed to be Cesar Jauregui, who is a Mexican National, CD-1 told a Jauregui that he had a friend who buys guns legally from a store, so CD-1 should be able to get 6 firearms for Jauregui.

129.    In December 2022, CD-1 sent photos of a .38 revolver and a Girsan MCP35 bearing Serial Number T6368-22EU05648 to an individual believed to be Juan Lerma, who is also a Mexican National.  Records reveal the Girsan was purchased by PICHARDO on December 5, 2022. CD-1 sent a photo of a Glock 21, Serial Number LAS853 and a DTI-15, 5.56 caliber, Serial Number S259142 to Lerma and asked how much he would pay for these firearms. Within this same conversation CD-1 told Lerma that he has a friend buying guns from a store now and inquired how much they are selling for now. CD-1 claimed his last shipment was in August of last year where he sold similar firearms.

---

[13] CD-1 has no identified criminal history. CD-1 has provided information to law enforcement in the hope of consideration towards his pending federal charges. Based on the corroboration of information provided by CD-1, I believe that he has provided accurate and truthful information regarding his illegal purchase of firearms from PICHARDO, whom he knows as RAMON.

130.    The following is a transcription[14] of January 2023 audio messages exchanged between CD-1 and RAMON (who law enforcement believe to be PICHARDO) obtained from the phone seized by HSI described above. A review of CD-1's WhatsApp contacts revealed Target Telephone-1 to be listed as a contact with the label, "RAMON ELKHART".

**CD-1:**      What's up?

**RAMON:**    Here, chilling and you? Are you already in Canada?

**CD-1:**      No, buddy. We're getting there tomorrow. Yeah, we're going over there tomorrow. We rented a hotel for the night, and we should be arriving to Canada the following. Yeah…

**RAMON:**    Alright, alright… So, you're on your way there. You are not here, in Elkhart?

**CD-1:**      Good morning, buddy. I took off this morning from there, from Elkhart. I still have 18 something hours to get there *[Canada]*. I still have a long way to go, but we're chugging along.

**RAMON:**    That's what's up, buddy. Good luck and it was a pleasure to have worked… Well, we are ready for anything you need. Just give me a call when you are ready. We'll keep in touch to see when I can come visit you there, in Canada, Ontario.

**CD-1:**      No, buddy. The pleasure was all mine. That's right, we'll continue making deals. Just wait for everything to sell over there. Give me about two (2) weeks and I will have something new for you- - to request you. Yeah, two (2) weeks to a month so you spend a little bit of time without buying anything and then you start again. Alright, we'll leave things as they are for now until they send me the rest of the money. Alright, thank you very much, eh. I will let you know when I arrive over there *[Canada]*.

**RAMON:**    Alright, alright, buddy! Same, it was a pleasure. Either way, we already created a friendship and have each other's contact information to keep greeting each other and communicating.  I will slowly continue getting those long ones you told me about.  Are you listening to rap music?

**CD-1:**      [LAUGHS] No, some songs are rap, but I like the corridos or Spanish songs better. Yah, try to grab the hunting ones, 223s, AK47, and R15s… Just make sure they are not very… they are not a ridiculous caliber. I mean, R15 like the caliber of 300, 300 barrels, I think it is. They do not want those. Only 223 caliber, and

_____

[14] The recitation of calls is based on a preliminary review of the line-sheet and/or call, and is in draft form and subject to revision upon further review.

AK47 or [UI].  But yeah, send me photos when you get something for a good price, and I will tell you 'Yes or no'. Yeah.

**RAMON:**        Alright, alright.

### L.  Historical Package and Toll Information

131.    As detailed above, investigators received information from the USPIS that on May 1, 2023, two packages were mailed from Scott City, Kansas to **Target Location-3**. Investigators ultimately, through CHS-1, conducted the controlled purchase of the four firearms which were contained within boxes matching the description and weight of the packages received by DIAZ at **Target Location-3** on May 3, 2023. Information from USPIS reflects similar prior packages. Information regarding other packages connected to the GTO members and toll records for the GTO members' phones reflect additional firearms trafficking using the USPS.

### i.    Subject Parcel-1

132.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-1") had a tracking number of 9505 5265 4166 3088 5474 32. The parcel bore the following return address: "Orlando Diaz," at the address for Target Location-6 (minus the apartment number) in Diamond Bar, CA 91765, and the recipient address as: "Angely Diaz" at **Target Location-3**. Subject Parcel-1 was mailed from a contract post office named, CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625. SUBJECT PARCEL-1 was mailed on March 29, 2023, at approximately 14:55, was paid for with cash and weighed approximately 4 lbs. Subject Parcel-1 was delivered to **Target Location-3** on March 31, 2023, at approximately 09:47 a.m. Per Postal records, the following IPs tracked Subject Parcel-1:

| IP | Date | Time |
|---|---|---|
| 104.173.229.239 | 03/29/2023 | 17:20:21 |
| 174.195.196.78 | 03/30/2023 | 06:28:45 |
| 174.204.64.88 | 04/01/2023 | 15:31:36 |
| | 04/01/2023 | 15:31:55 |
| 2600:100f:b029:c65d:340b:464e:a8b:60d8 | 03/31/2023 | 19:54:05 |
| | 03/31/2023 | 19:55:11 |
| | 03/31/2023 | 19:56:19 |
| | 04/01/2023 | 10:06:28 |
| | 04/02/2023 | 20:45:13 |
| | 04/02/2023 | 20:45:28 |
| | 04/02/2023 | 20:45:49 |
| | 04/02/2023 | 20:46:24 |
| | 04/02/2023 | 20:47:06 |
| | 04/02/2023 | 20:47:29 |
| | 04/03/2023 | 08:52:31 |
| | 04/03/2023 | 08:52:33 |
| | 04/03/2023 | 08:52:38 |
| 2600:1010:b121:2658:5563:c775:d470:66cc | 03/31/2023 | 10:09:39 |
| | 03/31/2023 | 10:12:05 |
| 2600:1012:b141:c43f:15d2:914b:6832:d9a6 | 03/30/2023 | 14:40:30 |
| | 03/30/2023 | 14:40:38 |

133.     Information received from Verizon pertaining the IPV6 data associated with 2600:100f:b029:c65d:340b:464e:a8b:60d8 between March 31, 2023, at 10:32 p.m. through April 1, 2023, at 4:32 a.m., revealed an association with MSISDN of 9095385064. Verizon records associated with MSISDN 9095385064 revealed it to be associated with Account Number 442452494-1, an account subscribed to FERNANDO SOTO, and business "MF EXPRESS LLC". The address associated with the account was identified as the address for Target Location-6 (minus the apartment number) in Diamond Bar, CA 91765 and lists the number assigned to Target Telephone-3 as his work phone. Given this information, I believe SOTO was checking the tracking information for Subject Parcel-1 as it made its way from SOTO's location in Diamond Bar, California, to DIAZ at **Target Location-3** in Hartford, Connecticut.

134.     On April 12, 2023, a USPIS Task Force Officer (TFO) responded to Cyclone Private Boxes to review video footage pertaining to Subject Parcel-1 shipped on March 29, 2023.

A review of the video footage revealed a male subject (photograph below) described as a Hispanic, with a beard, wearing a black baseball hat and a blue 'NY Yankees' jersey and matching the description of SOTO.



135.    The TFO conducted a check of License Plate Reading Camera images in the area of Cyclone Private Boxes and located a blue Ford Mustang hit on a camera in the area on March 29, 2023, at 5:34:50 p.m. This Mustang had a license plate of Connecticut registration 8WPB820 and was registered to Fernando SOTO Jr., at the address for Target Location-6 (including the apartment number) in Diamond Bar, CA 91765 22734.

136.    Toll records reveal that Target Telephone-3 (used by SOTO) and **Target Telephone-4** (used by DIAZ) had six contacts on March 28, 2023, the day before Subject Parcel-1 was mailed. Target Telephone-1 (used by PICHARDO) and Target Telephone-2 (used by BAKER) had eight contacts on the day Subject Parcel-1 was mailed (March 29, 2023). Target Telephone-2 (used by BAKER) and Target Telephone-3 (used by SOTO) had nine contacts on the day Subject Parcel-1 was mailed. Target Telephone-1 (used by PICHARDO) and Target Telephone-2 (used by BAKER) had eight contacts on March 30, 2023 (the day after Subject Parcel-1 was mailed and one day prior to its delivery). Target Telephone-2 (used by BAKER) and Target Telephone-3 (used by SOTO) had five contacts on March 31, 2023 (the day Subject

Parcel-1 was delivered to **Target Location-3**). Target Telephone-3 (used by SOTO) and **Target Telephone-5** (used by PEREZ) had one contact on March 31, 2023.

### ii. Subject Parcel-2

137.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-2") had a tracking number of 9505 5116 2542 3086 2600 95 was mailed from the Scott City Main Post Office, 211 S Main Street, Scott City, KS 67871-9998 on March 27, 2023. Subject Parcel-2 was paid for with cash and weighed approximately 8 lbs. 14 ounces. Subject Parcel-2 was delivered to **Target Location-3** on March 29, 2023.

138.    Toll records reveal that Target Telephone-2 (used by BAKER) and Target Telephone-3 (used by SOTO) had four contacts on the day Subject Parcel-2 was mailed (March 27, 2023). Target Telephone-3 (used by SOTO) and **Target Telephone-5** (used by PEREZ) had three contacts the day Subject Parcel-2 was delivered to **Target Location-3** (March 29, 2023).

### iii. Subject Parcel-3 and Subject Parcel-4

139.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-3") had a tracking number of 9505 5265 4167 3075 1492 11 was mailed from CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625 on March 16, 2023. Subject Parcel-3 was paid for with cash and weighed approximately 4 lbs. 7 ounces. Subject Parcel-3 was delivered to **Target Location-3** on March 18, 2023.

140.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-4") had a tracking number of 9505 5265 4167 3075 1492 35 was mailed from CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625 on March 16, 2023. Subject Parcel-4 was paid for with cash and weighed approximately 4 lbs. 7 ounces. Subject Parcel-4 was delivered to **Target Location-3** on March 18, 2023.

141.     Toll records reveal that Target Telephone-2 (used by BAKER) and Target Telephone-3 (used by SOTO) had five contacts on the day Subject Parcel-3 and Subject Parcel-4 were mailed (March 16, 2023). Target Telephone-3 (used by SOTO) and **Target Telephone-4** (used by DIAZ) had on contact the day Subject Parcel-3 and Subject Parcel-4 were mailed. Target Telephone-1 (used by PICHARDO) and Target Telephone-2 (used by BAKER) had eight contacts on the day Subject Parcel-3 and Subject Parcel-4 were delivered to **Target Location-3** (March 18, 2023). Target Telephone-2 (used by BAKER) and Target Telephone-3 (used by SOTO) had eleven contacts between March 17, 2023, and March 18, 2023. Target Telephone-3 (used by SOTO) and **Target Telephone-4** (used by DIAZ) had twenty contacts between March 17, 2023, and March 18, 2023. **Target Telephone-4** (used by DIAZ) and Target Telephone-3 (used by SOTO) had fourteen contacts on March 18, 2023. **Target Telephone-4** (used by DIAZ) and **Target Telephone-5** (used by PEREZ) had seven contacts on March 18, 2023.

### iv. Subject Parcel-5

142.     A review of USPS records revealed that a package (hereafter, "Subject Parcel-5") had a tracking number of 9505 5265 4167 3048 1464 14 was mailed from CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625 on February 17, 2023. Subject Parcel-5 was paid for with cash and weighed approximately 5 lbs. 2 ounces. Subject Parcel-5 was delivered to Target Location-3 on February 21, 2023.

143.     A review of tolls records reflects that Target Telephone-2 (used by BAKER) and Target Telephone-1 (used by PICHARDO) had forty contacts between February 16, 2023, and February 17, 2023 (the day Subject Parcel-5 was mailed from California). Target Telephone-3 (used by SOTO) and Target Telephone-2 (used by BAKER) had one contact on February 17, 2023. Target Telephone-1 (used by PICHARDO) and Target Telephone-2 (used by BAKER) had

twenty-two contacts on February 20, 2023 (the day before Subject Parcel-5 was delivered to **Target Location-3**). Target Telephone-3 (used by SOTO) and Target Telephone-2 (used by BAKER) had six contacts between February 20, 2023, and February 21, 2023. Target Telephone-3 (used by SOTO) and **Target Telephone-4** (used by DIAZ) had six contacts on February 21, 2023. Target Telephone-3 (used by SOTO) and **Target Telephone-5** (used by PEREZ) had one contact on February 21, 2023.

### v. Additional Subject Parcels and Shipper Information

144.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-6") had a tracking number of 9505 5265 4166 3006 5300 10 was mailed from CPU Cyclone Private Boxes, located at 23545 Palomino Drive, Ste A, Diamond Bar, CA 91765-1625 on January 6, 2023. Subject Parcel-6 was paid for with cash and weighed approximately 4 lbs. 4 ounces. Subject Parcel-6 was delivered to **Target Location-3** on January 9, 2023.

145.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-7") had a tracking number of 9505 5133 7372 3031 5436 74 mailed on January 31, 2023, from the Diamond Bar Post Office, 1317 S Diamond Bar Blvd., Diamond Bar, CA 91765 to and was addressed to "Brian Baker," at a particular address on Church St, Scott City KS 67871. Subject Parcel-7 weighted approximately 14 ounces and was delivered on February 7, 2023.

146.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-8") had a  tracking number of 9505 5265 4166 3093 5494 45 was mailed from CPU Cyclone Private Boxes on April 3, 2023. Subject Parcel-8 was paid for with cash and weighed approximately 1 lb. Subject Parcel-8 had the return address of "Fernando Rosario, [at the address for Target Location-6 minus the apartment number] " and was addressed to "Tommy Motors, [at the address for Target Location-4]". The parcel was delivered on April 7, 2023. A query of open-

source databases and Accurint did not reveal a business "Tommy Motors" to be associated with Target Location-4. SOTO is associated with Target Location-6. BAKER is associated with Target Location-4. I believe that SOTO shipped Subject Parcel-8, using a fake name and purposely did not include "Unit 344" on the return address to hide the identity of him as the sender of the packages. Additionally, I believe that SOTO used "Tommy Motors" to hide the identity of the package recipient, BAKER. I believe that the weight and manner in which Subject Parcel-8 was shipped is consistent with United States Currency being mailed as payment for illegal transactions of the GTO.

147.    A review of USPS records revealed that a package (hereafter, "Subject Parcel  9") had a tracking number of 9505 5265 4166 3093 5494 69 was mailed on April 3, 2023, approximately one minute later than Subject Parcel-8 at the same location. Subject Parcel-9 was paid for with cash and weighed approximately 2 lbs. 8 ounces. Subject Parcel-9 had a return address of "Fernando Soto, [at the address for Target Location-6 minus the apartment number] and was addressed to "Tommy Motors, [at the address for Target Location-4]" The parcel was delivered on April 7, 2023.

148.    I believe that SOTO using his true name on the return address label of Subject Parcel-9 yet a fake name on the return label of Subject Parcel-8 mailed shortly before, evidences that Subject Parcel-8 and Subject Parcel-9 were shipped by SOTO and that the contents of Subject Parcel-8 and Subject Parcel-9 were nefarious in nature because of the fictitious names used for the return and recipient labels, both of which appear to be an effort to dispel suspicion about multiple packages being mailed separately but at the same time from the same location to the same location. As set forth below, there is a pattern whereby SOTO utilizes his true name on some of the packages but varies the shipper's name on the packages sent.

149.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-10") had a  tracking number of 9505 5131 6521 3066 4200 17, was mailed from Barry Square Station, 645 Maple Ave, Hartford, CT 06114-9998 on March 7, 2023. Subject Parcel-10 weighed approximately 1 lb. Subject Parcel-10 had a return address of  "Lizzette Martinez, 170 Park St 1st FL, Hartford, CT 06106," and was addressed to "TJ Motor CO, [at the address for Target Location-4]". The parcel was delivered on March 10, 2023. I believe that the weight and manner in which Subject Parcel-10 was shipped is consistent with United States Currency being mailed as payment for illegal transactions of the GTO.

150.    A review of USPS records revealed that a package (hereafter, "Subject Parcel-11") had a  tracking number of 9505 5144 9687 3059 6487 87, was mailed from the Colton Main Post Office, 265 N 7th Street, Colton, CA 92324-2952 on February 28, 2023. Subject Parcel-11 weighed approximately 10 ounces. Subject Parcel-11 had a return address of "Fernando Soto, 22734 Lakeway DR, Unit 344, Diamond Bar CA 91765 and was addressed to "Tommy Johnson, [at the address for Target Location-4]". The parcel was delivered on March 3, 2023. I believe that the weight and manner in which Subject Parcel-11 was shipped is consistent with United States Currency being mailed as payment for illegal transactions of the GTO

151.    A review of the return addresses associated with the labels for the Subject Parcel described above revealed the following shipper information associated with each parcel:

- Subject Parcel-1, "Orlando Diaz"

- Subject Parcel-2, [No return address identified][15]

- Subject Parcel-3, "Fernando Diaz"

---

[15] This package was mailed from Scott City, Kansas, and is believed to have been mailed by BAKER.

- Subject Parcel-4, "Fernando Diaz"

- Subject Parcel-5, "Jose Diaz"

- Subject Parcel-6, "Angel [Last Name unintelligible]"

- Subject Parcel-7, "Fernando Soto"

- Subject Parcel-8, "Fernando Rosario"

- Subject Parcel-9, "Fernando Soto"

- Subject Parcel-10, "Lizzette Martinez"

- Subject Parcel-11, "Fernando Soto."

152.    I believe that the package shipped from Kansas to **Target Location-3** was shipped by BAKER and the packages shipped from California to **Target Location-3** were shipped by SOTO. Investigators note that BAKER's residence in Scott City, Kansas is .7 miles from the post office from which Subject Parcel-2 was shipped. Investigators note that SOTO's residence/business (Target Location-6) in Diamond Bar, California is 1.5 miles from the contract post office from which Subject Parcel-1, Subject Parcel-3, Subject Parcel-4, Subject Parcel-5, Subject Parcel-6, Subject Parcel-7, Subject Parcel-8, and Subject Parcel-9 were shipped. The post office in Colton, California, is approximately 33.6 miles from Target Location-6. The post office in Hartford from which Subject Parcel-10 was shipped is approximately 0.4 miles from DIAZ's residence (**Target Location-2**) and approximately 0.2 miles from the stash location (**Target Location-3**).

153.    I believe that the smaller packages shipped from SOTO to BAKER, (Subject Parcel-7, Subject Parcel-8, Subject Parcel-9, and Subject Parcel-11), as well as Subject Parcel-10, shipped from Hartford to BAKER) are consistent with United States Currency being mailed as payment for the firearms purchased in Kansas and mailed for sale by the GTO.

154.     I believe that the larger packages shipped from SOTO to DIAZ/PEREZ at **Target Location-3** are consistent with firearms being mailed for sale by the GTO.

155.     I believe that SOTO and BAKER use **Target Location-3** to ship firearms to lower the risk of law enforcement's ability to obtain the true attribution of the package shippers and recipients. Investigators note that **Target Location-3** is .2 miles from DIAZ's residence (**Target Location-2**) in Hartford, Connecticut. Because the recipient of the package, DIAZ, does not actually live at the address in which the firearms are delivered to by the GTO, members of the GTO are forced to check the tracking information associated with each package and use the Target Telephones to communicate with each other to coordinate the shipments of the firearms. As detailed above, in conjunction with the suspected delivery firearms to **Target Location-3**, DIAZ, using **Target Telephone-4**, communicated with SOTO, using Target Telephone-3, and PEREZ, using **Target Telephone-5**.

## K.  Summary

156.     Given all of the foregoing, there is probable cause to believe that the GTO members are engaged in a firearm trafficking operation whereby firearms are ordered in locations such as Connecticut and then purchased in Kansas. GTO members in Kansas (BAKER) and California (SOTO) broker the transactions involving the mailed firearms.

### i.     Target Location-1 & Target Location-7

157.     As described in the paragraphs set forth above, PEREZ is a GTO member who sells illegally obtained firearms and narcotics, including cocaine and cocaine base. Based on his

representations during meetings with CHS-1, PEREZ, a multi-convicted felon currently on

supervised release, arms himself with two firearms during his illegal activities.

158.    **Target Location-1** is PEREZ's residence. During the investigation, PEREZ has

been observed traveling to and from the **Target Location-1** before and immediately after

controlled narcotic and firearm purchases. Further, as detailed above, CHS-1 met with PEREZ at

**Target Location-7** on April 26, 2023, to discuss the purchase of firearms. A review of the

audio/video recording device worn by CHS-1 during the meeting between PEREZ and CHS-1

revealed that PEREZ received a Facetime phone call from a male voice. During the phone call,

the male voice asked a question which was unintelligible. PEREZ responded, "let me finish the

one I'm doing then I got you." The male voice then says, "I'm right here." A review of the pole

camera footage in the area of **Target Location-7** on April 26, 2023, revealed that at 8:44 p.m.,

an unknown male (hereafter, "UM-3") walked up to **Target Vehicle** and stood outside of it while

CHS-1 and PEREZ met. At 8:50 p.m., CHS-1 exited the **Target Vehicle**, entered his/her vehicle

and departed the area. UM-3 entered the **Target Vehicle**. Approximately one minute later, UM-3

exited the **Target Vehicle** and walked into **Target Location-7**. Soon after, an individual

matching the description of UM-3 walked out of **Target Location-7** and walked up to the

driver's window of the **Target Vehicle** where he appeared to have a conversation with PEREZ.

UM-3 then departed the area out of view of pole camera footage. Soon after, the **Target Vehicle**

departed the parking lot for **Target Location-7**. A review of the GPS information associated

with the tracker installed on the **Target Vehicle** revealed that the **Target Vehicle** appeared to

travel directly to **Target Location-1** without making stops along the way. It is my belief that the

man who entered **Target Vehicle** was the caller. Based on my training and experience, and the

large quantity of drugs that Perez had on hand during the meeting with CHS-1, I believe the call

was from a customer who was seeking to buy illegal drugs from PEREZ and that the transaction occurred in the **Target Vehicle** outside **Target Location-7**. This is further supported by UM-3 exiting **Target Vehicle** after a brief time.

159.    Additionally, on May 10, 2023, at approximately 9:23 p.m., investigators observed a vehicle matching the description of the **Target Vehicle** pull into the parking lot of **Target Location-7**. A review of the location information associated with the GPS device installed on **Target Vehicle** confirmed the vehicle to be in the parking lot of **Target Location-7** at that time. Approximately five minutes later, a white utility truck pulled into the parking lot of **Target Location-7** and parked next to the **Target Vehicle**. An unidentified male (hereafter, UM-1) exited the white truck and stood next to the **Target Vehicle** and appeared to smoke a cigarette. Soon after, an unidentified male (hereafter, UM-2) exited the front passenger seat of the **Target Vehicle** and walked out of view of pole camera footage.[16] Upon UM-2 exiting the **Target Vehicle**, UM-1 entered the front passenger seat. Approximately seven minutes later, UM-1 exited the **Target Vehicle** then reentered the white utility truck and departed the area out view of pole camera footage. A review of the GPS data associated with the device installed on **Target Vehicle** revealed that it traveled to the parking lot in the area of 1069 Huntingdon Avenue, Waterbury, Connecticut.

160.    An investigator conducting physical surveillance observed PEREZ hugging an unidentified male in the parking lot then reentering **Target Vehicle** soon after. **Target Vehicle** departed the parking lot, then, based on a review of GPS data, appeared to park at the dead end

---

[16] A review of pole camera footage was unable to determine at what point UM-2 entered **Target Vehicle**, but given the pattern of activity law enforcement has observed, I believe that UM-2 entered **Target Vehicle** upon PEREZ parking in the lot.

of Bellevue Street, a street parallel to **Target Location-1**. I believe, based on my training and experience, and the pattern of illegal activity between CHS-1 and PEREZ, that PEREZ arranged to meet UM-1 and UM-2 at the parking lot for **Target Location-7** and that the nature of their meeting involved criminal conduct. After UM-2 exited **Target Vehicle**, I believe that UM-1 entered **Target Vehicle** to engage in some illegal activity. As detailed in this affidavit, PEREZ and CHS-1 met at **Target Location-7** to conduct illegal narcotics and firearms sales. Their meetings were longer in duration, matching the approximate duration of the meet between PEREZ and UM-1. Further, I believe that PEREZ parked **Target Vehicle** at the dead end of Bellevue Street to "clean" himself before returning to **Target Location-7**. I know, based on my training and experience, that some individuals who traffic illegal narcotics will conduct counter-surveillance for law enforcement or rival drug dealers. By parking at a dead-end road, PEREZ would be able to easily determine if he was being followed. A review of the GPS data associated with **Target Vehicle** revealed that soon after parking on the dead-end road, **Target Vehicle** travelled to **Target Location-1** where a surveillance unit observed PEREZ exit **Target Vehicle** and walk up the front steps of **Target Location-1**.

161.    PEREZ has also represented to **Target Location-7** is owed/operated by his wife. PEREZ has also insinuated to CHS-1 that **Target Location-7** is a safer place to conduct illegal transaction because of such ownership.

162.    Accordingly, given PEREZ's travels from **Target Location-1** to **Target Location-7** and back, his use of parking lot of **Target Location-7** to conduct illegal transactions, and PEREZ's entry/exit from **Target Location-7** in connection to illegal transactions, there is probable cause to believe and I do believe that evidence of the Subject Offenses, particularly

proceeds from the narcotic and firearm transactions as well as other firearms or narcotics in PEREZ's possession, will be located within **Target Location-7** and **Target Location-1**.

### ii.    Target Location-2 & Target Location-3

163.    As described in the paragraphs set forth above, DIAZ is a GTO member who sells illegally obtained firearms. During officer surveillance and pole camera footage, DIAZ has been observed traveling between his residence (**Target Location-2**) and the stash location (**Target Location-3**). He has also been observed receiving multiple packages that were ultimately determined to contain firearms. The communication by the GTO members around the mailing and delivery of packages as well as that some of the packages appear open when PEREZ retrieves the packages from **Target Location-3** evidence that DIAZ is aware that the packages contain firearms. PEREZ has also represented to CHS-1 that he pays someone to receive packages of firearms on his behalf. Given the storage at **Target Location-3** of the firearms received in the mail as well as evidence that Diaz is receiving money in exchange for the firearms, there is probable cause to believe and I do believe that evidence of the Subject Offenses, such as money, receipts, packaging materials, and packaging labels will be located within **Target Location-3**. Additionally given Diaz's travels directly from **Target Location-2** to **Target Location-3** and back, there is probable cause to believe and I do believe that evidence of the Subject Offenses, particularly money, will be located within **Target Location-2**.

### iii.    Target Location-4

164.    As described above, BAKER, a convicted felon, is believed to be broking firearm transactions involving firearms purchased by others, including PICHARDO and BAKER's wife. BAKER utilizes the USPS to ship firearms illegally in the mail. Given the direction of the shipments back to Kansas and the weight of the packages, I believe Subject Parcel-7, Subject

Parcel-8, Subject Parcel-9, Subject Parcel-10, and Subject Parcel-11 each contained proceeds from the illegal firearm transactions. Given the firearm transactions confirmed via controlled purchases, the use of the USPS to ship the firearms, the high number of firearms purchased by PICHARDO identified to date, the photos evidencing multiple firearms available to purchase from the GTO members, and the contact amongst the GTO members, there is probable cause to believe, and I do believe that BAKER's residence (Target Location-4) will contain evidence of the Target Offenses such as receipts, packaging labels or materials, firearm proceeds, and other firearms available for purchase.

### iv.    Target Location-5

165.    As described above, law enforcement has identified 73 firearms to date purchased by PICHARDO in less than a three-year period. PICHARDO purchased all of these identified firearms from a single dealer and many of his firearm purchases involved the purchase of multiple firearms at time. The time between PICHARDO's purchase of firearms and the recovery of such firearms has also been short, evidencing that he had no intention of retaining the firearms at the time of his purchase but rather was purchasing the firearms for another. Indeed, with respect to the controlled purchase on May 11, 2023, PICHARDO purchased a specific firearms on May 9, 2023, after CHS-1 requested to purchase that particular type of firearm on May 4, 2023. More specifically, on May 4, 2023, CHS-1 received pictures of firearms from **Target Telephone-5** (used by PEREZ). The firearms were described by PEREZ and appeared to be Tec9 style firearms. The pictures that were sent looked to be stock photos of a Sol Invictus Arms Model Tac-9. PEREZ texted CHS-1 "just came in tech 9s." CHS-1 expressed interest in purchasing that kind of firearm. It was learned that PICHARDO purchased four (4)

firearms on May 9, 2023. One of the firearms purchased by PICHARDO on that day was a Sol Invictus Arms Model Tac-9, 9mm, bearing Serial Number T-00398.[17]

166.    Text messages on May 4, 2023, from **Target Telephone-5** (used by PEREZ)



167.    Make and model of firearm purchased by PICHARDO on May 9, 2023:

---

[17] CHS-1 has yet to purchase this firearm.



168.     Information from CD-1 also indicates that the PICHARDO's involvement in illegal firearm transactions such as the ones pertaining to firearms shipped to Connecticut is not the result of a mistake or an unintentional act but rather is part of a pattern of criminal conduct in which his ability to purchase firearms for others is key. Given the firearm transactions confirmed via controlled purchases, the use of the USPS to ship the firearms, the high number of firearms purchased by PICHARDO identified to date, the photos evidencing multiple firearms available to purchase from the GTO members, and the contact amongst the GTO members, there is probable cause to believe, and I do believe that PICHARDO's residence (Target Location-5) will contain evidence of the Target Offenses such as receipts, firearm proceeds, and other firearms available for purchase.

### v.     Target Location-6

169.     As described above, SOTO, a convicted felon, is believed to be broking firearm transactions involving firearms purchased by others, including PICHARDO and BAKER's wife. SOTO utilizes the USPS to ship firearms and firearm proceeds illegally in the mail. He has

checked on the status of mailed firearms via the internet, including from Target Location-6, and

by telephone. Video footage confirms that he personally has mailed at least on package believed

to contain firearms. Several of the packages believed to contain firearms reflect the address of

Target Location-6, minus the specific apartment number. Suspected money packages also bear

the address for Target Location-, including the specific apartment number. Given the firearm

transactions confirmed via controlled purchases, the use of the USPS to ship the firearms, the

high number of firearms purchased by PICHARDO identified to date, the photos evidencing

multiple firearms available to purchase from the GTO members, and the contact amongst the

GTO members, there is probable cause to believe, and I do believe that SOTO's shared

residence/business (Target Location-6) will contain evidence of the Target Offenses such as

receipts, packaging labels or materials, firearm proceeds, and other firearms available for

purchase.

### vi.    Target Vehicle

170.    As described above, PEREZ has been observed on multiple occasions utilizing

**Target Vehicle** in connection to the Subject Offenses. He has met with the CHS-1 to discuss and

conduct transactions involving firearms and narcotics within **Target Vehicle**. He has professed

to store firearms in the vehicle and has used **Target Vehicle** to transport firearms for sale as well

as to transport firearm proceeds. He has shown CHS-1 firearms and narcotics stored within the

vehicle. Based on all the foregoing, there is probable cause to believe, and I do believe, that

evidence of the Subject Offenses will be located within **Target Vehicle**.

### vii.    GTO members and Target Telephones

171.    As described above, GTO members are working together to traffic firearms

purchased and/or located within Kansas and shipped to Connecticut using the USPS. The GTO

members have utilized their respective cellular telephones (Target Telephones) in furtherance of such activities by communicating with each other concerning the shipment and delivery of firearm packages, as well as to facilitate the order of specific firearms. As reflected above, with the assistance of CHS-1, law enforcement has purchase nine (9) firearms, of which eight (8) of these firearms were specifically chosen after the GTO members showed CHS-1 pictures of firearms available to purchase via a cellular telephone. Toll records and surveillance evidence that GTO members have communicated repeatedly in connection to the Subject Offenses. GTO members, in particular SOTO, utilized his cellular telephone (Target Telephone-3) to check on the delayed firearms that were ultimately obtained via the third controlled purchase on May 12, 2023. Accordingly, there is probable cause to believe, and I do believe, that each of the Target Telephones will contain evidence of the Subject Offenses.

172.    Further, as discussed below, most individuals carry their cellphone either on their person or have the phone readily available for use. In this case, the repeated communications indicate that the GTO members keep their respective cellular devices close by and readily accessible for contact with other GTO members. Thus, if the requested search warrants are authorized for the Target Telephones, there is probable cause to believe and I do believe that each of the GTO members will either have his cellular telephone on his person, near his person, or within his residence at the time law enforcement seeks to execute such search warrants. In order to identify a particular cellular device as a particular Target Telephone-, law enforcement will call the number assigned to the particular Target Telephone- and seek to identify the particular Target Telephone- by a responsive ring. As a criminal complaint is not sought at this time for BAKER, I seek authorization to search his person for evidence of the Subject Offenses, including Target Telephone-2. As a criminal complaint is not sought at this time for SOTO, I

seek authorization to search his person for evidence of the Subject Offenses, including Target Telephone-3.

## <u>BIOMETRICS AND CELLULAR TELEPHONES<br>INCLUDING TARGET TELEPHONES</u>

173.     The warrant I am applying for would permit law enforcement to obtain from individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) to unlock the **Target Telephones** or other devices seized pursuant to the warrants.

174.     I seek this authority based on the following:

    a.   As noted above, I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices (e.g., an Apple iPhone), offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

    b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, the technology company Apple Inc., offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is

found in the round button (often referred to as the "home" button) located
at the bottom center of the front of the device. The fingerprint sensors
found on devices produced by other manufacturers have different names
but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable
the ability to unlock the device through his or her face. For example,
Apple offers a facial recognition feature called "Face ID."  During the
Face ID registration process, the user holds the device in front of his or her
face. The device's camera then analyzes and records data based on the
user's facial characteristics. The device can then be unlocked if the camera
detects a face with characteristics that match those of the registered face.
Facial recognition features found on devices produced by other
manufacturers have different names but operate similarly to Face ID.

175.    In my training and experience, users of electronic devices often enable the
aforementioned biometric features because they are considered to be a more convenient way to
unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in
some instances, biometric features are considered to be a more secure way to protect a device's
contents. This is particularly true when the users of a device are engaged in criminal activities
and thus have a heightened concern about securing the contents of a device.

176.    I also know from my training and experience, as well as from information found
in publicly available materials including those published by device manufacturers, that biometric
features will not unlock a device in some circumstances even if such features are enabled. This
can occur when a device has been restarted, inactive, or has not been unlocked for a certain

period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. See About Face ID advanced technology. https://support.apple.com/en-us/HT208108 (published February 26, 2020). Biometric features from other brands carry similar restrictions. Thus, in the event a device(s) is located and equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

177.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, if the attempt to unlock the **Target Telephone-** via  biometric feature is unsuccessful, law enforcement will attempt to forensic unlock the device.

1.    Due to the foregoing, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs), to the fingerprint scanner of the device; (2) hold the device in front of his face to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant with respect to the **Target Telephones**, or with respect to any other cellular device(s) seized (but not searched) from the **Target Locations**, enter the device solely to

a) change the passcode to allow reentry and b) place the device into airplane mode to facilitate subsequent search by a separate warrant if sought and obtained.

178.    I am not requesting that any force be authorized to effectuate a press or swipe of fingers or to activate facial recognition features. Should anyone refuse to unlock devices using biometric features, I will promptly notify the Court to request an order to show cause for refusal to unlock devices using biometric features, and/or a further order to compel, and/or a request that the refusing individual be held in contempt of this Court.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS OF THE TARGET TELEPHONES

179.    The warrant applied for the **Target Telephones** would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

180.    As described above and in Attachment B-11, the undersigned Affiant seeks permission to search and seize evidence that the **Target Telephones** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

181.    Searching for the evidence described in Attachment B-11 may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals

can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B-11 or perusing all stored information briefly to determine whether it falls within the scope of the warrant. Considering these difficulties, FBI, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B-11.

182.    Based on my training and experience, as well as information asserted herein, there is probable cause to believe, and I do believe, that within the **Target Telephones** there will be found items which constitute evidence of the crimes of the Subject Offenses, and with respect to **Target Telephone-5**, also evidence of violations of 18 U.S.C. § 924(c) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).

183.    Based on my training, experience, I also know that the **Target Telephones** may have some or all of the capabilities that allow each phone to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA).  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

184.    With regards to the **Target Telephones**, I request permission to seize and search the **Target Telephones** for evidence relating to the Subject Offenses, and with respect to **Target**

**Telephone-5**, also evidence of violations of 18 U.S.C. § 924(c) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).

185.    Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used by co-conspirators to communicate efforts to conduct criminal activities and it is likely that the **Target Telephones** was used by the defendant to communicate with co-conspirators regarding the Subject Offenses. Furthermore, based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics, or conspire to do so. Also based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics. Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics, the quantity of narcotics, as well as shipping packages within which the narcotics are concealed. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics:

      a.   the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

      b.   the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

      c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

d.  any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said devices;

h.  internet browsing history, to include, internet searches in the memory of said device; and

i.  images and videos in the memory of said device.

186.    It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often

necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

187.    It is also requested that the warrant be deemed executed once the items listed in Attachment B-11 have been begun from the phone and that further analysis of the seized items be permitted at any time thereafter.

188.    It is also requested that stored electronic information, data, information and images contained in the **Target Telephones** may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

## <u>MANNER OF EXECUTION WITH RESPECT TO</u><br><u>CELL-SITE-SIMULATOR LOCATION INFORMATION</u>

189.    In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

190.    To facilitate execution of these warrants, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Telephones or receiving signals from cellular devices, including the Target Telephones. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others.  The device may send a signal to the Target Telephones and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals

broadcast by the Target Telephones and use that information to determine the Target

Telephones' locations, even if it is located inside a house, apartment, or other building.

191.    The investigative device may interrupt cellular service of phones or other cellular

devices within its range. Any service disruption to non-target devices will be brief and

temporary, and all operations will attempt to limit the interference with such devices. In order to

connect with the Target Telephones, the device may briefly exchange signals with all phones or

other cellular devices in its range. These signals may include cell phone identifiers. The device

will not complete a connection with cellular devices determined not to be the Target Telephones,

and law enforcement will limit collection of information from devices other than the Target

Telephones. To the extent that any information from a cellular device other than the Target

Telephones is collected by the law enforcement device, law enforcement will delete that

information, and law enforcement will make no investigative use of it absent further order of the

court, other than distinguishing the Target Telephones from all other cellular devices.

192.    Based on the foregoing, I request that the Court issue the proposed search

warrants authorizing the use of cell-site simulator location information, pursuant to Federal Rule

of Criminal Procedure 41. The proposed warrants also will function as a pen register order under

18 U.S.C. § 3123.

193.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

30 days from the end of the period of authorized surveillance. This delay is justified because

there is reasonable cause to believe that providing immediate notification of the warrant may

have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the

subscriber or user of the Target Telephones would seriously jeopardize the ongoing

investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

194.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephones outside of daytime hours.

## SEALING

195.    I further request that the Court order that all papers in support of these applications, including the affidavit, attachments, complaints, arrest warrants, and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## <u>CONCLUISON</u>

196.    Based on the forgoing, I request that the Court issue the proposed arrest warrants,

criminal complaints, and search warrants.

Respectfully submitted,

CORBETT
TOMSOVIC

Digitally signed by
CORBETT TOMSOVIC
Date: 2023.05.16
08:39:40 -04'00'

CORBETT TOMSOVIC
SPECIAL AGENT, FBI

Subscribed and sworn to me by telephone or other reliable means on May \_\_16\_\_, 2023

Robert M.
Spector

Digitally signed by Robert
M. Spector
Date: 2023.05.16
09:49:45 -04'00'

HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**Property to Be Searched**

■ *Winchester Street, Waterbury, Connecticut (Target Location-1)*



A multi-family residence with light-colored siding and deck attached to the front of the residence. The building is believed to be a duplex that contains two side-by-side units. The number "■" is marked next to the right door on the front of the residence. Law enforcement believes the door on the right side of the residence in the photo above is the door to LUIS PEREZ's residence. A query of the Connecticut On-Line Law Enforcement Communications Teleprocessing revealed LUIS PEREZ to be associated the address for Target Location-1.

This authorization includes the above-described location, all rooms and other parts therein, together with the surrounding grounds, all safes, lock boxes, or locked containers found therein, and any garages, storage rooms, trash containers, and storage areas designated for the use of the specifically described residence.

## ATTACHMENT B-1

### *Property to Be Seized*

I.  Evidence of violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing of Firearms); Title 18 U.S.C. §§ 933(a)(1). 933(a)(2) (Trafficking in Firearms); Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations) (hereafter referred to as the "Subject Offenses") by Ramon PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, and Luis PEREZ and others, as well as violations of 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Possession with the Intent to Distribute and Distribution of a Controlled Substance) by Luis PEREZ and others, specifically the following:

1.  Firearms, silencers, ammunition, firearm accessories, or materials that could be manufactured into firearms or silencers including but not limited to frames/receivers, upper assemblies, items classified under the National Firearms Act (NFA), or materials used in furtherance of the manufacture, use, or otherwise completion of the aforementioned items.

2.  Photographs of firearms or silencers; documentation of the purchase, storage, possession, disposition, dominion and control of firearms or silencers, including paperwork and receipts.

3.  Records and information concerning firearms or silencers trafficking and the remittance of firearms or silencers sales proceeds, to include books, receipts, notes, ledgers, notebooks, computer spreadsheets, and other forms of pay/owe sheets, in whatever form.

4.  Proceeds from illicit transferring or manufacturing of firearms or silencers, including United States and foreign currency, cashiers' checks, money orders, cryptocurrency, and other financial instruments.

5.  Records and information concerning customers or other individuals to whom firearms or silencers may have been distributed.

6.  Records and information constituting or concerning correspondence among o between individuals that relate in any way to RAMON PICHARDO, FERNANDO SOTO (also referred to as FERNANDO SOTO JR.), BRIAN BAKER, LUIS PEREZ, ALGELLY DIAZ, JENNIFER BAKER, or any other individuals purchasing, acquiring, selling, shipping, or transferring firearms or silencers.

7.  Records and information containing photographs and/ or videos depicting illegal use and possession of firearms or silencers.

8.  Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

9.  Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

10. Any books, records, receipts, notes, ledgers, journals, travel documents and other papers relating to the purchase and distribution of controlled substances;

11. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances.

12. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

13. Photographs of people, assets, or objects that may be related to the purchase and distribution of controlled substances;

14. Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

15. Records of travel in furtherance of the unlawful distribution of drugs or firearms;

16. Records of any communications relating to drug or firearms trafficking;

17. Records, information, and items regarding (i) dominion and control over the PREMISES, (ii) the identity or known aliases of LUIS PEREZ, or (iii) the existence or location of any storage areas or containers where evidence of violations of the Subject Offenses may be found. Such records, information, and items would include personal identification documents, keys to the Target Location-1 or storage areas, documents and papers bearing names and addresses, rental receipts, lease agreements, mortgage records, utility bills, canceled mail, paycheck stubs or other employment records.

18. Any cellular telephone assigned telephone number 860-672-8243, located near LUIS PEREZ, or otherwise under LUIS PEREZ's control.

## ATTACHMENT A-2

### Property to Be Searched

 *Franklin Avenue, Apartment 1N, Hartford, Connecticut (Target Location-2)*



A three-story brick apartment building. A query of Accurint revealed ALGELLY DIAZ to be associated with the address of Target Location-2. Apartment 1N is location within the common entry door labeled ████," which is the door at the top of the stairs leading to the building (second door from the left of the building out of four doors).  Inside the common door, there are mailboxes located to the right on a brick wall. Further down the short hallway is a staircase which leads to the second floor. Immediately before the staircase, to the right, is a door labeled "1N" with a security camera above the entry. Law enforcement believe DIAZ's unit is behind the door labeled "1N"

This authorization includes the above-described location, all rooms and other parts therein, together with the surrounding grounds, all safes, lock boxes, or locked containers found therein, and any garages, storage rooms, trash containers, and storage areas designated for the use of the specifically described residence.

## ATTACHMENT B-2

### *Property to Be Seized*

I.  Evidence of violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing of Firearms); Title 18 U.S.C. §§ 933(a)(1). 933(a)(2) (Trafficking in Firearms); Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations) (hereafter referred to as the "Subject Offenses") by Ramon PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, and Luis PEREZ and others, specifically the following:

1.  Firearms, silencers, ammunition, firearm accessories, or materials that could be manufactured into firearms or silencers including but not limited to frames/receivers, upper assemblies, items classified under the National Firearms Act (NFA), or materials used in furtherance of the manufacture, use, or otherwise completion of the aforementioned items.

2.  Photographs of firearms or silencers; documentation of the purchase, storage, possession, disposition, dominion and control of firearms or silencers, including paperwork and receipts.

3.  Records and information concerning firearms or silencers trafficking and the remittance of firearms or silencers sales proceeds, to include books, receipts, notes, ledgers, notebooks, computer spreadsheets, and other forms of pay/owe sheets, in whatever form.

4.  Proceeds from illicit transferring or manufacturing of firearms or silencers, including United States and foreign currency, cashiers' checks, money orders, cryptocurrency, and other financial instruments.

5.  Records and information concerning customers or other individuals to whom firearms or silencers may have been distributed.

6.  Records and information constituting or concerning correspondence among or between individuals that relate in any way to RAMON PICHARDO, FERNANDO SOTO (also referred to as FERNANDO SOTO JR.), BRIAN BAKER, LUIS PEREZ, ALGELLY DIAZ, JENNIFER BAKER, or any other individuals purchasing, acquiring, selling, shipping, or transferring firearms or silencers.

7.  Records and information containing photographs and/ or videos depicting illegal use and possession of firearms or silencers.

8.  Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

9.  Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

10. Any books, records, receipts, notes, ledgers, journals, travel documents and other papers relating to the purchase and distribution of controlled substances;

11. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances.

12. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

13. Photographs of people, assets, or objects that may be related to the purchase and distribution of controlled substances;

14. Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

15. Records of travel in furtherance of the unlawful distribution of drugs or firearms;

16. Records of any communications relating to drug or firearms trafficking;

17. Records, information, and items regarding (i) dominion and control over the PREMISES, (ii) the identity or known aliases of ALGELLY DIAZ, or (iii) the existence or location of any storage areas or containers where evidence of violations of the Subject Offenses may be found. Such records, information, and items would include personal identification documents, keys to the Target Location-2 or storage areas, documents and papers bearing names and addresses, rental receipts, lease agreements, mortgage records, utility bills, canceled mail, paycheck stubs or other employment records.

18. Any cellular telephone assigned telephone number 860-996-4514, located near ALGELLY DIAZ, or otherwise under ALGELLY DIAZ's control.

## ATTACHMENT A-3

### Property to Be Searched

### ▮ *Whitmore Street, Hartford, Connecticut (Target Location-3)*



A multi-family residence with yellow siding, cement steps, and red brick pillars. Target Location-3 is the second-floor unit. Target Location-3 is accessed through the left door of the front of the residence with the double red brick pillars that opens into a common hallway with a staircase. Law enforcement believe Target Location-3 is accessed by going up the staircase that leads to the second-floor unit. Based on the observation of three mailboxes, law enforcement believes there are three units total in the building, one unit per floor. A mailbox on the left side of the door was labeled "Algelly L. Diaz 2 Floor."

This authorization includes the above-described location, all rooms and other parts therein, together with the surrounding grounds, all safes, lock boxes, or locked containers found therein, and any garages, storage rooms, trash containers, and storage areas designated for the use of the specifically described residence.

**ATTACHMENT B-3**
***Property to Be Seized***

I.  Evidence of violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing of Firearms); Title 18 U.S.C. §§ 933(a)(1). 933(a)(2) (Trafficking in Firearms); Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations) (hereafter referred to as the "Subject Offenses") by Ramon PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, and Luis PEREZ and others, specifically the following:

1.  Firearms, silencers, ammunition, firearm accessories, or materials that could be manufactured into firearms or silencers including but not limited to frames/receivers, upper assemblies, items classified under the National Firearms Act (NFA), or materials used in furtherance of the manufacture, use, or otherwise completion of the aforementioned items.

2.  Photographs of firearms or silencers; documentation of the purchase, storage, possession, disposition, dominion and control of firearms or silencers, including paperwork and receipts.

3.  Records and information concerning firearms or silencers trafficking and the remittance of firearms or silencers sales proceeds, to include books, receipts, notes, ledgers, notebooks, computer spreadsheets, and other forms of pay/owe sheets, in whatever form.

4.  Proceeds from illicit transferring or manufacturing of firearms or silencers, including United States and foreign currency, cashiers' checks, money orders, cryptocurrency, and other financial instruments.

5.  Records and information concerning customers or other individuals to whom firearms or silencers may have been distributed.

6.  Records and information constituting or concerning correspondence among or between individuals that relate in any way to RAMON PICHARDO, FERNANDO SOTO (also referred to as FERNANDO SOTO JR.), BRIAN BAKER, LUIS PEREZ, ALGELLY DIAZ, JENNIFER BAKER, or any other individuals purchasing, acquiring, selling, shipping, or transferring firearms or silencers.

7.  Records and information containing photographs and/ or videos depicting illegal use and possession of firearms or silencers.

8.  Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

9.  Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

10. Any books, records, receipts, notes, ledgers, journals, travel documents and other papers relating to the purchase and distribution of controlled substances;

11. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances.

12. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

13. Photographs of people, assets, or objects that may be related to the purchase and distribution of controlled substances;

14. Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

15. Records of travel in furtherance of the unlawful distribution of drugs or firearms;

16. Records of any communications relating to drug or firearms trafficking;

17. Records, information, and items regarding (i) dominion and control over the PREMISES, (ii) the identity or known aliases of ALGELLY DIAZ, or (iii) the existence or location of any storage areas or containers where evidence of violations of the Subject Offenses may be found. Such records, information, and items would include personal identification documents, keys to the Target Location-3 or storage areas, documents and papers bearing names and addresses, rental receipts, lease agreements, mortgage records, utility bills, canceled mail, paycheck stubs or other employment records.

18. Any cellular telephone assigned telephone number 860-996-4514, located near ALGELLY DIAZ, or otherwise under ALGELLY DIAZ's control.

## ATTACHMENT A-7

**Property to Be Searched**

***159 Manor Avenue, Waterbury, Connecticut (Target Location-7)***



A single-story building with red and gray outer walls. The building has a yellow sign with red lettering, "LAUNDROMAT".

This authorization includes the above-described location, all rooms and other parts therein, together with the surrounding grounds, all safes, lock boxes, or locked containers found therein, and any garages, storage rooms, trash containers, and storage areas designated for the use of the specifically described business.

## <u>ATTACHMENT B-7</u>

### *Property to Be Seized*

I.  Evidence of violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a
Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C.
§ 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing
of Firearms); Title 18 U.S.C. §§ 933(a)(1). 933(a)(2) (Trafficking in Firearms); Title 18
U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title 18 U.S.C. § 1715 (Firearms as
Nonmailable; Regulations) (hereafter referred to as the "Subject Offenses") by Ramon
PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, and Luis PEREZ and
others, as well as violations of 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of
a Drug Trafficking Offense) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Possession with the
Intent to Distribute and Distribution of a Controlled Substance) by Luis PEREZ and others,
specifically the following:

1.  Firearms, silencers, ammunition, firearm accessories, or materials that could be
manufactured into firearms or silencers including but not limited to frames/receivers,
upper assemblies, items classified under the National Firearms Act (NFA), or materials
used in furtherance of the manufacture, use, or otherwise completion of the
aforementioned items.

2.  Photographs of firearms or silencers; documentation of the purchase, storage, possession,
disposition, dominion and control of firearms or silencers, including paperwork and
receipts.

3.  Records and information concerning firearms or silencers trafficking and the remittance
of firearms or silencers sales proceeds, to include books, receipts, notes, ledgers,
notebooks, computer spreadsheets, and other forms of pay/owe sheets, in whatever form.

4.  Proceeds from illicit transferring or manufacturing of firearms or silencers, including
United States and foreign currency, cashiers' checks, money orders, cryptocurrency, and
other financial instruments.

5.  Records and information concerning customers or other individuals to whom firearms or
silencers may have been distributed.

6.  Records and information constituting or concerning correspondence among or between
individuals that relate in any way to RAMON PICHARDO, FERNANDO SOTO (also
referred to as FERNANDO SOTO JR.), BRIAN BAKER, LUIS PEREZ, ALGELLY
DIAZ, JENNIFER BAKER, or any other individuals purchasing, acquiring, selling,
shipping, or transferring firearms or silencers.

7.  Records and information containing photographs and/ or videos depicting illegal use and
possession of firearms or silencers.

8. Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

9. Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

10. Any books, records, receipts, notes, ledgers, journals, travel documents and other papers relating to the purchase and distribution of controlled substances;

11. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

12. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

13. Photographs of people, assets, or objects that may be related to the purchase and distribution of controlled substances;

14. Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

15. Records of travel in furtherance of the unlawful distribution of drugs or firearms; and

16. Records of any communications relating to drug or firearms trafficking.

17. Any cellular telephone assigned telephone number 860-672-8243, located near LUIS PEREZ, or otherwise under LUIS PEREZ's control.

# ATTACHMENT A-8

## Property to Be Searched

Target Vehicle is a 2013 gray Infiniti Coupe bearing Connecticut registration BH38075 (Target Vehicle) registered to Luis Perez at the address known in this investigation as Target Location-1. Target Vehicle is known to be operated by Luis Perez in the District of Connecticut.



## <u>ATTACHMENT B-8</u>

### *Property to Be Seized*

I.  Evidence of violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a
    Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C.
    § 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing
    of Firearms); Title 18 U.S.C. §§ 933(a)(1). 933(a)(2) (Trafficking in Firearms); Title 18
    U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title 18 U.S.C. § 1715 (Firearms as
    Nonmailable; Regulations) (hereafter referred to as the "Subject Offenses") by Ramon
    PICHARDO, Brian BAKER, Fernando SOTO Jr., Algelly DIAZ, and Luis PEREZ and
    others, as well as violations of Title 18 U.S.C. § 924(c) (Possession of a Firearm in
    Furtherance of a Drug Trafficking Offense); and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)
    (Possession with the Intent to Distribute and Distribution of a Controlled Substance) by Luis
    PEREZ and others, specifically the following:

1.  Firearms, silencers, ammunition, firearm accessories, or materials that could be
    manufactured into firearms or silencers including but not limited to frames/receivers,
    upper assemblies, items classified under the National Firearms Act (NFA), or materials
    used in furtherance of the manufacture, use, or otherwise completion of the
    aforementioned items.

2.  Photographs of firearms or silencers; documentation of the purchase, storage, possession,
    disposition, dominion and control of firearms or silencers, including paperwork and
    receipts.

3.  Records and information concerning firearms or silencers trafficking and the remittance
    of firearms or silencers sales proceeds, to include books, receipts, notes, ledgers,
    notebooks, computer spreadsheets, and other forms of pay/owe sheets, in whatever form.

4.  Proceeds from illicit transferring or manufacturing of firearms or silencers, including
    United States and foreign currency, cashiers' checks, money orders, cryptocurrency, and
    other financial instruments.

5.  Records and information concerning customers or other individuals to whom firearms or
    silencers may have been distributed.

6.  Records and information constituting or concerning correspondence among or between
    individuals that relate in any way to RAMON PICHARDO, FERNANDO SOTO (also
    referred to as FERNANDO SOTO JR.), BRIAN BAKER, LUIS PEREZ, ALGELLY
    DIAZ, JENNIFER BAKER, or any other individuals purchasing, acquiring, selling,
    shipping, or transferring firearms or silencers.

7.  Records and information containing photographs and/ or videos depicting illegal use and
    possession of firearms or silencers.

8.  Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

9.  Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

10. Any books, records, receipts, notes, ledgers, journals, travel documents and other papers relating to the purchase and distribution of controlled substances;

11. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances.

12. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

13. Photographs of people, assets, or objects that may be related to the purchase and distribution of controlled substances;

14. Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

15. Records of travel in furtherance of the unlawful distribution of drugs or firearms;

16. Records of any communications relating to drug or firearms trafficking;

17. Any cellular telephone assigned telephone number 860-672-8243, located near LUIS PEREZ, or otherwise under LUIS PEREZ's control.

## ATTACHMENT A-11

### Property To Be Searched

Cellular telephones, more particularly described below and collectively referred to as the "Target Telephones."

This warrant authorizes the forensic examination of the Target Telephones for the purpose of identifying the electronically stored information described in Attachment B-11.

The Target Devices are described as follows:

      1.      Cellular device assigned 860-996-4514 (hereafter referred to as "Target Telephone-4");

      2.      Cellular device assigned 860-672-8243 (hereafter referred to as "Target Telephone-5").

**ATTACHMENT B-11**

Particular Things to be Seized

I.    All records and information contained in the Target Telephones violations of federal law, specifically, violations of  federal law, including violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing of Firearms); Title 18 U.S.C. §§ 933(a)(1). 933(a)(2) (Trafficking in Firearms); Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations); (hereafter referred to as the "Subject Offenses") by RAMON PICHARDO, FERNANDO SOTO (also referred to as FERNANDO SOTO JR.), BRIAN BAKER, LUIS PEREZ, ALGELLY DIAZ, and others, and with respect to Target Telephone-5, also evidence of violations of 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Possession with the Intent to Distribute and Distribution of a Controlled Substance), by LUIS PEREZ and others, to include the following:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to the Subject Offenses;

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said telephone;

8. internet browsing history, to include, internet searches in the memory of the telephone;

9.  images and videos in the memory of the telephone; and,

10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

II.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

III.    It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

IV.     To the extent that the Target Telephones contain removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

V.      This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

VI.     USE OF BIOMETRIC DATA TO UNLOCK CELLULAR TELEPHONES

1.      During the execution of the search, law enforcement personnel are specifically authorized to obtain from ALGELLY DIAZ (Target Telephone-4); or LUIS PEREZ (Target Telephone-5) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any cellular telephone(s) requiring such biometric access that are subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person's physical biometric characteristics will unlock the cellular telephone(s).

2.      While attempting to unlock the cellular telephone by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the cellular telephone(s). Nor does the warrant authorize law

enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person for the password to any cellular telephone(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any cellular telephone(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

**ATTACHMENT A-12**

This warrant authorizes the use of the electronic investigative technique described in

Attachment B-12 to identify the location of the following cellular devices:

      a.  860-996-4514 (hereafter referred to as "Target Telephone-4"), which is subscribed to "Fernando Soto," believed to be used by DIAZ and located in the District of Connecticut, whose wireless provider is Verizon;

      b.  860-672-8243 (hereafter referred to as "Target Telephone-5"), which is subscribed to "Geraldo Jameson," believed to be used by PEREZ and located in the District of Connecticut, whose wireless provider is AT&T.

**ATTACHMENT B-12**

Pursuant to an investigation of violations of  federal law, including violations of Title 18 U.S.C. § 922(a)(6) (False Statement in Purchase of a Firearm); Title 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); Title 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); Title 18 U.S.C. § 932 (Straw Purchasing of Firearms); Title 18 U.S.C. §§ 933(a)(1). 933(a)(2) (Trafficking in Firearms); Title 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); Title 18 U.S.C. § 1715 (Firearms as Nonmailable; Regulations); (hereafter referred to as the "Subject Offenses") by RAMON PICHARDO, FERNANDO SOTO (also referred to as FERNANDO SOTO JR.), BRIAN BAKER, LUIS PEREZ, ALGELLY DIAZ, and others, and with respect to Target Telephone-5, also evidence of violations of 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (Possession with the Intent to Distribute and Distribution of a Controlled Substance), by LUIS PEREZ and others, this Warrant authorizes the officers to whom it is directed to determine the location of the cellular devices identified in Attachment A-12 by collecting and examining:

1. radio signals emitted by the cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and
2. radio signals emitted by the cellular device in response to radio signals sent to the cellular device by the officers

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).